[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No.  14-11942
_____

Agency No. RIN 1219-AB64

NATIONAL MINING ASSOCIATION,
ALABAMA COAL ASSOCIATION,
WALTER ENERGY, INC.,
WARRIOR INVESTMENT CO., INC.,

Petitioners,

versus

SECRETARY, U.S. DEPARTMENT OF LABOR,
MINE SAFETY AND HEALTH ADMINISTRATION,

Respondents.

_____

No. 14-12163
_____

Agency No. 14-3427

MURRAY ENERGY CORPORATION,
AMERICAN ENERGY CORPORATION,
THE OHIO VALLEY COAL COMPANY,
THE AMERICAN COAL COMPANY,
OHIOAMERICAN ENERGY, INCORPORATED,
UTAHAMERICAN ENERGY, INCORPORATED,
WEST RIDGE RESOURCES, INCORPORATED,

KENAMERICAN RESOURCES, INCORPORATED,
MURRAY AMERICAN ENERGY, INCORPORATED,
THE HARRISON COUNTY COAL COMPANY,
THE MARION COUNTY COAL COMPANY,
THE MARSHALL COUNTY COAL COMPANY,
THE MONONGALIA COUNTY COAL COMPANY,
THE OHIO COUNTY COAL COMPANY,

Petitioners,

versus

SECRETARY OF LABOR,
MINE SAFETY AND HEALTH ADMINISTRATION,

Respondents.

_____

Petitions for Review of a Decision of the
Federal Mine Safety and Health Administration

_____

(January 25, 2016)

Before WILSON, FAY and RIPPLE[*], Circuit Judges.

TABLE OF CONTENTS

I.    Background...........................................................................................5
      A. Summary of the New Dust Rule .......................................................5
      B. Positions of the Parties ...........................................................9
II.   Legislative and Regulatory Context  .....................................................12
      A. Early Regulation of the Mining Industry and the Coal Act ...............12
      B. The Mine Act.................................................................21
      C. Regulatory History Following the Mine Act ...................................27

_____

[*] Honorable Kenneth F. Ripple, United States Circuit Judge for the Seventh Circuit, sitting by designation.

III.   MSHA's Authority to Regulate...............................................................31
       A. The Statutory Provisions ....................................................32
       B. The Authority to Impose Single-Shift Sampling ...............................34
       C. The Authority to Enact Other Substantive Regulations......................36
IV.    Substantive Challenges: The Content of the New Dust Rule ................40
       A. Standard of Review ...........................................................40
       B. Single-Shift Sampling .......................................................44
            1.  Statutory and accuracy-related challenges............................45
            2.  Feasibility of single-shift sampling..................................54
       C. Technological Feasibility of Other Major Provisions
          of the New Dust Rule ........................................................56
            1.  Mandatory use of the CPDM ...........................................57
                 a.  Accuracy challenges to the CPDM..............................59
                 b.  Assumptions underlying MSHA data and requests
                     to supplement the record before the court .....................61
                 c.  Malfunction rate of the CPDM.......................................63
                 d.  Performance at varying temperatures
                     and humidities.................................................66
                 e.  CPDM as an impediment to miners' ability
                     to perform work ................................................68
                 f.  Availability of the CPDM...........................................68
            2.  The silica standards................................................69
            3.  The cumulative effect of the New Dust Rule's
                changes...................................................................73
       D. Economic Feasibility.........................................................74
       E. Other Challenges ............................................................78
            1.  National regulation................................................78
            2.  Use of respirators to achieve air quality standards ..................81
            3.  Experience under other health and safety laws.......................82
Conclusion .........................................................................83

RIPPLE, Circuit Judge:

On May 1, 2014, the Secretary of Labor published in the Federal Register a

Final Rule for the Mine Safety and Health Administration ("MSHA") entitled

Lowering Miners' Exposure to Respirable Coal Mine Dust, Including Continuous

Personal Dust Monitors, 79 Fed. Reg. 24,814 (codified at 30 C.F.R. pts. 70, 71, 72, 75, 90) ("New Dust Rule").  Two separate groups, representing the coal industry,[1] then brought pre-enforcement challenges in the Courts of Appeals for the Sixth and Eleventh Circuits. The Panel on Multidistrict Litigation consolidated the challenges here.  The petitioners first challenge the authority of MSHA, an agency within the Department of Labor, to issue the rule under the Federal Mine Safety and Health Act of 1977 ("Mine Act"),  *see* Pub. L. 95-164, codified as amended at 30 U.S.C. § 801 *et seq*.  Specifically, the petitioners submit that, on many of the subjects covered by the rule, MSHA is required to act in concert with the Secretary of Health and Human Services ("HHS") and her designee, the National Institute for Occupational Safety and Health ("NIOSH").  Second, the petitioners challenge the substance of the rule, raising a variety of detailed objections.

On the first challenge, we now conclude that, consistent with the plain language of the statute and with the earlier precedent of this court, the statute as amended clearly evinces a congressional intent that, although it must consider the advice of NIOSH, MSHA has the sole responsibility to issue regulations covering the subjects addressed by this rule.  Here, as anticipated by the statute, MSHA received the views of NIOSH on every required topic.  Nothing more is required.

---

[1] The petitioners in Case No.14-11942 are the National Mining Association and several Alabama-based coal mine operators. The petitioners in Case No. 14-12163 are also coal mine operators; we will refer to them collectively as "Murray Energy."

4

With respect to the second challenge, we conclude that MSHA's decades-long effort, culminating in the publication of this rule, adequately took into account the scientific evidence of record and arrived at conclusions which, given MSHA's expertise, are worthy of deference. We therefore deny the petitions for review.

## I. Background

### A. Summary of the New Dust Rule

For nearly sixty years, Congress and various federal agencies working at its behest have worked to improve safety and health standards for workers in our Nation's mines. A primary focus of this effort has been respirable coal dust ("RCD")—dust generated by coal mining that is sufficiently small to enter a miner's respiratory system. Inhalation of RCD puts coal workers at risk for pulmonary diseases, including coal worker's pneumoconiosis ("CWP," commonly known as Black Lung Disease), silicosis, chronic obstructive pulmonary disease, emphysema, and chronic bronchitis. The regulation under review is the latest effort to address this hazard.

In 2010, MSHA, acting alone, proposed the New Dust Rule to address RCD and its known health outcomes. Lowering Miners' Exposure to Respirable Coal Mine Dust, Including Continuous Personal Dust Monitors, 75 Fed. Reg. 64,412 (proposed Oct. 19, 2010). In our review of an earlier and very similar regulatory attempt, *National Mining Ass'n v. Secretary of Labor*, 153 F.3d 1264, 1269 (11th

Cir. 1998), we expressed concern that MSHA's effort had failed to determine the economic feasibility of single-shift sampling, the same monitoring process at issue in this case. In response to our decision, MSHA initiated a new rulemaking and, as part of that process, issued an economic analysis addressing that concern. It also opened the record for comment and extended the comment period three times, finally closing it in June 2011. After making alterations to respond to the comments received to its proposed rule, MSHA promulgated its final rule in 2014. 79 Fed. Reg. 24,814.

The New Dust Rule phases in a series of significant changes to RCD regulations over a two-year period, beginning in August 2014. The first phase saw the implementation of three basic changes: (1) mine operators began to take air quality samples over the entire shift of a miner rather than over a maximum of eight hours, or a miner's shift, if shorter, 30 C.F.R. § 70.201(c); (2) mine operators were required to take samples over a "normal production shift," now defined as one in which the amount of material produced is "at least equal to 80 percent of the average production recorded by the operator for the most recent 30 production shifts" rather than one where production was only required to be at least 50 percent of the average of the prior five bimonthly samples, *id.* § 70.2; and (3) for the first time, compliance determinations would be based on Excessive Concentration Values ("ECVs"), *id.* § 70.206(e), (f). ECVs are measurements of RCD so high

6

that, as a statistical matter and accounting for a certain amount of measurement uncertainty, they demonstrate with 95 percent certainty that the true concentration of RCD exceeded the allowable limit.  The use of ECVs allows operators the benefit of some margin of measurement-related error by requiring not only that the regulatory RCD standard be exceeded, but that it be exceeded by a margin that assures for MSHA, with a degree of statistical confidence, that the measurement demonstrating noncompliance was not erroneous.[2]  When an on-site *MSHA inspector* sees a single, full-shift sample with an ECV, MSHA will issue a citation to the operator, *id.* § 72.800.  When an *operator* sees a *single*, full-shift sample with an ECV, it must take immediate corrective action to reduce RCD concentration and make available respiratory equipment to affected miners, *id.* § 70.206(e).  If two or more samples by an operator in the preceding five exceed the ECV, or if the average of all five exceeds the ECV, MSHA will issue a citation. *Id.* § 70.206(f).  The reliance on individual sample results is a significant change

---

[2] MSHA notes, by way of example, that if the applicable limit is 1.5 milligrams per cubic meter, ECVs resulting in citations are 1.79 and 1.70 for measurements taken with coal mine dust personal sampler units ("CMDPSUs") and Continuous Personal Dust Monitors ("CPDMs"), respectively.  MSHA Br. 50 n.26; Lowering Miners' Exposure to Respirable Coal Mine Dust, Including Continuous Personal Dust Monitors, 79 Fed. Reg. 24,814, 24,980, Table 70-1 (listing ECVs applicable to single-shift measurements) and Table 70-2 (listing ECVs applicable to 5 or 15 full-shift measurements); *see also infra* pp. 30–31, 49–50 & note 24 (regarding sampling devices).

from the prior sampling regime, which is based on multi-shift averaging.  It is also

at the core of the petitioners' objections.

In the next phase, commencing in February 2016, operators must use

Continuous Personal Dust Monitors ("CPDMs") to measure concentrations in the

dustiest jobs at each section.  *Id.* § 70.201.[3]  Sampling frequency also increases: on

a quarterly basis, fifteen samples must be taken on consecutive normal production

shifts in the designated occupation, and then fifteen samples in other designated

occupations; prior standards required only five designated occupation samples

bimonthly.  *Id.* § 70.208(a).[4]  Over this longer sampling period, when three or more

of the fifteen samples meet the ECV, or when the average of all fifteen exceeds the

ECV, MSHA will issue a citation.  *Id.* § 70.208(f).

In the final phase, beginning in August 2016, the maximum acceptable

concentration limit of RCD reduces to 1.5 milligrams per cubic meter (mg/m$^3$).  *Id.*

§ 70.100(a)(2).  Notably, NIOSH's 1995 Criteria Document called for a further

---

[3] Continuing from the 1980 standard, the rule requires measurements at the "designated occupation," which is the job with the highest dust exposure on a section.  *See* 30 C.F.R. § 70.2. On a continuous mining section, it is the continuous mining machine operator; on the longwall mining section it is the tailgate-side shearer operator.  *Id.* § 70.208(b)(3), (7).  The rule also requires measurements at "other designated occupations," drawn from a list of ten other jobs, *see id.* § 70.208(b), which MSHA describes as the next one-to-four dustiest locations, depending on the structure of the mine.

[4] The proposed rule would have required constant monitoring, seven days a week, fifty‑ two weeks a year, in the "designated occupation."  *See* Lowering Miners' Exposure to Respirable Coal Mine Dust, Including Continuous Personal Dust Monitors, 75 Fed. Reg. 64,412, 64,489 (proposed Oct. 19, 2010); *see supra* note 3.

reduction to 1.0 mg/m$^3$, *see* I-QRA-23 at 108,[5] and the proposed rule itself had accepted that recommendation and required an accelerated timetable for compliance, 75 Fed. Reg. at 64,419, 64,492.  For areas of the mine and mine workers in which a lower a 1.0 mg/m$^3$ standard already applied (because they are in intake air entries or otherwise less dusty areas), the standard will become 0.5 mg/m$^3$.  30 C.F.R. §§ 70.100(b), 90.100.  The rule also changes the method of calculating the lower RCD values applicable to any mining operation where respirable quartz dust (also called respirable silica dust) is present, although it maintains current absolute limits of 0.1 mg/m$^3$ of respirable quartz.

## B.  Positions of the Parties

Within this context, we address the contentions of the parties.  The petitioners submit that MSHA has exceeded its authority. They first maintain that, by promulgating the New Dust Rule, the Secretary of Labor has rescinded *unilaterally* a 1972 Joint Finding of the Secretaries of Labor and of HHS under section 202(f) of the Mine Act, 30 U.S.C. § 842(f). That Joint Finding had determined that reliance on a single sample of RCD levels would be inaccurate and ought not be the basis for compliance determinations. In the petitioners' view, because the 1972 Joint Finding was issued jointly by the Secretaries of Labor and

[5] I-QRA-23 is the designation chosen by MSHA to refer to a particular document in the administrative record.  We shall, for the sake of consistently, use the numbering system provided by the parties when referring to the administrative record.

9

of HHS, those Secretaries must act together to rescind it. For the same reason, the petitioners attack the new exposure limits, schedules and requirements promulgated under the New Dust Rule. They read section 202(a), 30 U.S.C. § 842(a), as requiring joint rulemaking and promulgation by the Secretaries of Labor and of HHS.  Indeed, they continue, section 202(d) of the Mine Act, 30 U.S.C. § 842(d), reserves to HHS *alone* the authority to promulgate a schedule reducing RCD exposures below the levels set forth in the statute.

Turning to the substance of the New Dust Rule, the petitioners take issue with the sampling regime set up by that regulation. Noting that section 202(a) of the Mine Act, 30 U.S.C. § 842(a), requires that RCD sampling be accurate, they claim that the regulation permits too wide a variation to meet that statutory criterion.  They urge us to hold that, under the first step of the analysis set forth in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S. Ct. 2778 (1984), the regulation is invalid. The petitioners continue that, even if we determine that the statutory scheme is ambiguous, we should hold that the promulgation of the New Dust Rule was arbitrary and capricious because MSHA, acting on behalf of the Secretary of Labor, failed to demonstrate the technological and economic feasibility of the Final Rule. They submit that MSHA ignored the record evidence that single−shift sampling and a new sampling device

10

will increase, significantly, the possibility of inaccurate results. In their view, MSHA simply did not rely on the best available scientific evidence and experience.

The Secretary of Labor takes, as might be expected, a distinctly contrary view.  He maintains that the Mine Act, through section 101(a), 30 U.S.C. § 811(a), vests in the Secretary of Labor the authority to develop and to promulgate revised and improved mandatory health standards. As he reads the Act, the Secretary of HHS has the authority to *recommend* that certain criteria be established relating to harmful physical agents, but the authority to conduct rulemaking proceedings and to promulgate regulations belongs exclusively to the Secretary of Labor. Consequently, he reasons, he acted well within the bounds of his statutory authority in receiving from NIOSH its Criteria Document recommending extensive changes in the then-existing dust rules and incorporating some of them in the New Dust Rule.

Turning to the petitioners' substantive objections, the Secretary maintains that he reasonably determined that single-shift sampling accurately represents the average concentration of respirable dust in the mine during each shift. He points out that sampling methods and technology have improved since the 1972 Joint Finding and that studies have determined that single-shift sampling meets the criterion for accuracy recommended by NIOSH.  Relying on standards developed by MSHA and NIOSH, a research entity within the Department of HHS, he further

11

maintains that CPDMs are accurate and reliable instruments for the measurement of coal dust and will be available by the designated implementation date. He rejects the argument that respirators are more effective than the new device; in his view, the statute requires mine operators to comply with air quality standards without resort to respirators. He further maintains that the cost of compliance with the New Dust Rule amounts to less than one percent of annual revenues.

The Secretary also rejects the suggestion that, instead of the New Dust Rule, he should have promulgated a regional silica rule. In the Secretary's view, studies continue to show that miners in all regions of the United States continue to develop CWP. Agencies have the prerogative, he submits, to prioritize their regulatory agendas and to address different problems in different rulemaking proceedings.

Accordingly, the Secretary urges us to determine that the New Dust Rule is technologically and economically feasible.

## II. Legislative and Regulatory Context

### A. Early Regulation of the Mining Industry and the Coal Act

Before we analyze the specific challenges brought to us by the parties, we pause to give these submissions historical context by examining the overall statutory and regulatory scheme that governs mine health and safety issues in the United States.

12

From the late 19th century until the middle 20th, Congress enacted several discrete measures to increase mine safety. These measures established some minimum safety requirements, prohibited labor by children under twelve, established the Bureau of Mines in the Department of the Interior, and in 1947, authorized the development of safety regulations.[6]  Despite these efforts, mining, an essential occupation to the commercial health of a growing industrial society, remained one of the most dangerous occupations in the Nation.  In 1967–68, the Country experienced a series of mine accidents that killed more than 500 miners. In one incident, a devastating mine explosion near Farmington, West Virginia, seventy-eight miners died.  *See* H.R. Rep. No. 91-563, at 1 (1969).

Shortly thereafter, Congress enacted the Federal Coal Mine Health and Safety Act of 1969 ("Coal Act"), Pub. L. 91-173, 83 Stat. 742, codified as amended at 30 U.S.C. § 801 *et seq*.  Its express goal was to increase safety for mine workers in the United States.  The enacted findings in the Coal Act stated that:

> (a) the first priority and concern of all in the coal mining industry must be the health and safety of its most precious resource— the miner;
>
> . . . [and]

---

[6] *See generally* MSHA, *History of Mine Safety and Health Legislation*, www.msha.gov/MSHAINFO/MSHAINF2.HTM (last visited Dec. 20, 2015).

13

(c) there is an urgent need to provide more effective means and measures for improving the working conditions and practices in the Nation's coal mines in order to prevent death and serious physical harm, and in order to prevent occupational diseases originating in such mines. . . .

*Id.* § 2.  At the outset of the Title specifically setting health standards, the Coal Act also provided:

Among other things, it is the purpose of this title to provide, to the greatest extent possible, that the working conditions in each underground coal mine are sufficiently free of respirable dust concentration in the mine atmosphere to permit each miner the opportunity to work underground during the period of his entire adult working life without incurring any disability from pneumoconiosis or any other occupation-related disease during or at the end of such period.

*Id.* § 201(b).

At the time of its enactment, the Coal Act was the most comprehensive statute addressing health and safety matters in the Nation's mines. It set forth the most stringent requirements to date and, for the first time, provided for civil and criminal penalties for noncompliance.  It also addressed the growing medical knowledge about the progressive respiratory diseases suffered by coal miners. The Coal Act set forth "interim mandatory" health and safety standards in Titles II and III, respectively.  *Id.* §§ 201(a), 301(a).  Congress mandated that these interim standards were to remain "applicable to all underground coal mines until superseded in whole or in part by improved mandatory" health or safety standards to be promulgated under the provisions of section 101 of the Act.  *Id.*  It is

14

significant that the 1969 statute spoke in terms of "interim" standards. From the very outset, Congress envisioned a shifting landscape as improved health and safety measures became feasible and therefore implemented a regulatory structure that could focus on continuous improvement.  Indeed, to guard against regulatory backsliding, the statute mandated that "[n]o improved mandatory health or safety standard promulgated under this title shall reduce the protection afforded miners below that provided by any mandatory health or safety standard." *Id.* § 101(b).

Among the issues covered by the Coal Act was air quality, known to play a significant role in the development of the respiratory diseases common among mine workers.  Specifically, section 202 of the Coal Act required coal mine operators to "take accurate samples of the amount of respirable dust in the mine atmosphere to which each miner in the active workings of such mine is exposed." *Id.* § 202(a).   For the first three years after the Coal Act's enactment, the maximum acceptable level of RCD was 3.0 mg/m$^3$ of air.  *Id.* § 202(b)(1). Following that initial period, the maximum level fell to 2.0 mg/m$^3$.  *Id.* § 202(b)(2). The statute then contemplated a further reduction according to a schedule promulgated through regulation, "to a level of personal exposure which will prevent new incidences of respiratory disease and the further development of such disease in any person."  *Id.* § 202(d).

15

Notably, the Coal Act became law during a period when Congress addressed more broadly matters affecting the health and safety of the Nation's workforce. In 1970, the year following the passage of the Coal Act, Congress enacted the Occupational Safety and Health Act ("OSH Act"), Pub. L. 91-596, 84 Stat. 1590, codified as amended at 29 U.S.C. § 651 *et seq.* This statute created the Occupational Safety and Health Administration ("OSHA") in the Department of Labor and gave it broad regulatory and enforcement authority with respect to workplace safety standards. The OSH Act also created NIOSH, an agency within the Department of Health, Education, and Welfare ("HEW") charged with conducting research and developing recommendations for the prevention of work-related injuries and illnesses generally. *Id.* § 22, 29 U.S.C. § 671; *see also Nat'l Mining Ass'n v. Dep't of Labor*, 292 F.3d 849, 854 (D.C. Cir. 2002) (citing 29 U.S.C. § 671). The statute provided that, following its research, NIOSH would forward its recommendations to the Secretary of Labor for consideration of regulatory action through his designee, OSHA. Pub. L. 91-596, § 6(b)(1).

Congress assigned primary responsibility for implementation of the Coal Act to the Secretary of the Interior. Pub. L. 91-173, § 3(a). But the Act also assigned specific responsibility to other cabinet-level Departments, including, importantly, HEW. Section 101 established the procedure by which these Departments would work together to develop the improved standards. The Secretary of the Interior

had the responsibility to "develop, promulgate, and revise, as may be appropriate, improved mandatory *safety* standards for the protection of life and the prevention of injuries in a coal mine." *Id.* § 101(a) (emphasis added). In arriving at these standards, however, the Secretary of the Interior was to consult with the Secretaries of HEW and Labor, and others. *Id.* § 101(c).

For improved mandatory *health* standards, i.e., those items addressed substantively in Title II of the statute, and which are the principal concern of the present rule, the Coal Act required a more complicated process. In this area, the Secretary of HEW had the laboring oar and was to "develop and revise, as may be appropriate, improved mandatory health standards for the protection of life and the prevention of occupational diseases of miners." *Id.* at § 101(d). In arriving at these standards, the Secretary of HEW likewise was to consult with the Secretaries of the Interior and Labor, and others. The Coal Act required a somewhat unusual step after the Secretary of HEW developed comprehensive substantive health standards: he was directed to "transmit[]" those standards to the Secretary of the Interior. *Id.* The Secretary of the Interior then had the responsibility to publish the HEW-authored proposed mandatory health standards in the Federal Register. After receiving comments on these proposals, the Secretary of the Interior would "transmit[]" them to the Secretary of HEW. *Id.* § 101(e). The Secretary of HEW would then conduct hearings, if necessary, and review the comments, make public

17

findings of fact and substantive decisions, and, thereafter, "direct the Secretary [of the Interior] to promulgate such standards with such modifications as the Secretary of [HEW] may deem appropriate." *Id.* § 101(e); *see also id.* §101(g). In sum, the Secretary of HEW made the substantive decisions on health standards. The Secretary of the Interior, although generally responsible for implementation of most of the Coal Act, played a largely ministerial role as the promulgator of those standards.[7]

Although section 101 of the Coal Act provided the overarching procedural mechanism for developing improved mandatory standards, several additional provisions played supporting roles. Section 201 designated the relevant dust provisions in section 202 as interim mandatory health standards and provided that they would remain in effect "until superseded in whole or in part by improved mandatory health standards promulgated by the Secretary [of the Interior] under the provisions of section 101 of this Act." *Id.* § 201. Several additional substantive sections directed one or more of the Secretaries to act on a specific subject, frequently, though not invariably, cross-referencing section 101. *See, e.g.*, *id.* § 202(d) ("[T]he Secretary of [HEW] shall establish, in accordance with the

---

[7] The division of authority was not uncontroversial. Indeed, floor debates questioned the wisdom of having "one Cabinet-level Secretary . . . develop a set of rules and regulations and direct another Secretary to adopt them and enforce them." 115 Cong. Rec. H32021 (daily ed. Oct. 29, 1969) (statement of Rep. Erlenborn); *see also id.* at H32022 (statement of Rep. Dent) (supporting the division of authority).

provisions of section 101 of this Act, a schedule reducing the average concentration of respirable dust in the mine atmosphere . . . .").  Other provisions within section 202's list of interim mandatory standards directed action by one or both Secretaries without an internal explicit cross-reference to section 101 or 201. *See, e.g.*, *id.* § 202(a) ("Such samples shall be taken by any device approved by the Secretary [of Interior] and the Secretary of [HEW] and in accordance with such methods, at such locations, at such intervals, and in such manner as the Secretaries shall prescribe in the Federal Register . . . .").

The Coal Act provided that both safety standards, originating with Interior, and health standards, originating with HEW, were to "be based upon research, demonstrations, experiments, and such other information as may be appropriate." *Id.* § 101(c), (d).  Further, "[i]n addition to the attainment of the highest degree of . . . protection for the miner," the statute directed the respective Secretaries to consider "the latest available scientific data in the field, the technical feasibility of the standards, and experience gained under this and other health [or safety] statutes." *Id.*

The Coal Act specified two separate, sequential mechanisms for determining the average dust concentration.[8]  For the first eighteen months after enactment,

---

[8] The section reads, in full:

(continued . . .)

19

measurements were to be taken "over a number of continuous production shifts." *Id.* § 202(f). After that initial eighteen months, the dust concentration was to be measured "over a single shift only." *Id.* However, and central to the issue presented in this case, if the Secretaries of Interior and HEW jointly found that such a single measurement did not "accurately represent . . . atmospheric conditions," the prior method would continue to be used. *Id.*

Just months after the enactment of the 1969 Coal Act, the Secretary issued his first set of mandatory health standards implementing section 202. *See* Mandatory Health Standards—Underground Coal Mines, 35 Fed. Reg. 5,544 (Apr. 3, 1970). In 1972, the Secretaries finalized, and published in the Federal Register under the authority of both Departments, a summary Joint Finding that adoption of a single-shift testing scheme would not accurately measure the atmospheric conditions during the shift. Consequently, the multi-test averaging scheme

---

> For the purpose of this title, the term "average concentration" means a determination which accurately represents the atmospheric conditions with regard to respirable dust to which each miner in the active workings of a mine is exposed (1) as measured, during the 18 month period following the date of enactment of this Act, over a number of continuous production shifts to be determined by the Secretary [of the Interior] and the Secretary of [HEW], and (2) as measured thereafter, over a single shift only, unless the Secretary [of the Interior] and the Secretary of [HEW] find, in accordance with the provisions of section 101 of this Act, that such single shift measurement will not, after applying valid statistical techniques to such measurement, accurately represent such atmospheric conditions during such shift.

Federal Coal Mine Health and Safety Act, Pub. L. 91-173, § 202(f), 83 Stat. 742, 762–63 (1969).

remained in place. *See* Notice of Finding That a Single Shift Measurement of Respirable Dust Will Not Accurately Represent Atmospheric Conditions During Such Shift, 37 Fed. Reg. 3,833 (Feb. 23, 1972) ("1972 Joint Finding").

## B. The Mine Act

Five years later, in 1977, mining fatalities were still more than four times as great as the average in other industries.  H.R. Rep. No. 95-312, at 3 (1977). Dissatisfied with progress under the Coal Act,[9] Congress reenacted, amended, and consolidated the Coal Act and various other provisions of law, renaming it the Federal Mine Safety and Health Act ("Mine Act"), *see* Federal Mine Safety and Health Amendments Act, Pub. L. 95-164, 91 Stat. 1290.  Procedurally, it made significant changes to its predecessor.  In considering the Mine Act, the Senate Committee on Resources concluded that the prior enforcement efforts "demonstrated a basic conflict in the missions" of the Department of the Interior, which aimed to "maximiz[e] production in the extractive industries," a goal "not wholly compatible with the need to interrupt production," a "necessary adjunct of the enforcement scheme."[10]  To remove this conflict, the Mine Act designated the

---

[9] "[D]espite . . . considerable Congressional attention, our nation still experiences deaths and serious injuries in our mines at a rate which casts shame on an advanced, industrialized society. Every working day of the year, at least one miner is killed and sixty-six miners suffer disabling injuries in our nation's mines."  S. Rep. No. 95−181, at 4 (1977), *reprinted in* 1977 U.S.C.C.A.N. 3401, 3404.

[10] The relevant section of the Senate Committee Report reads, in full:

(continued . . .)

21

Secretary of Labor as having principal authority to implement the statute. It also created MSHA within the Department of Labor—a Department with experience on the issues of worker safety and with new divisions dedicated fully to safety issues. The statute placed within MSHA regulatory authority over mining health *and* safety standards. Mine Act § 101(a), 30 U.S.C. § 811(a); 29 U.S.C. § 557a (creating MSHA and authorizing and directing the Secretary of Labor to fulfill his functions under the Mine Act through MSHA).[11] Indeed, in making the shift from the Department of the Interior to the Department of Labor, the report of the House Committee on Education and Labor accompanying the Mine Act stated:

> The Secretary responsible for the health and safety of miners will no longer be the Secretary of the Interior, but rather the Secretary of

---

The history of the Interior Department's enforcement of these laws, either by the Bureau of Mines or by MESA, demonstrated a basic conflict in the missions of the Department. In past years, the Department has pursued the goal of maximizing production in the extractive industries, which was not wholly compatible with the need to interrupt production which is the necessary adjunct of the enforcement scheme under the Metal and Coal Acts: even though, in the Committee's view, over the long-run, improved health and safety promotes greater productivity through reduction of "down-time" and improved employee morale. In addition, lowered workers' compensation premiums which should result from improved safety and health, can be expected to lower production costs. On the other hand, no conflict could exist if the responsibility for enforcing and administering the mine safety and health laws was assigned to the Department of Labor since that Department has as its sole duty the protection of workers and the insuring of safe and healthful working conditions.

*Id.* at 5.

[11] The functions assigned to the Secretary of the Interior under the Coal Act were carried out from 1973–77 by the Mining Enforcement and Safety Administration ("MESA"), a predecessor entity to MSHA.

22

Labor, who represents an agency that puts the welfare of workers *above all other considerations*. The committee believes that by transferring administration of the miner health and safety program, and by upgrading legislative provisions applicable to metal and nonmetal miners through consolidation of all miners under one safety law, the Nation will be better able to meet the dual objectives of increased production of mineral and energy resources, and protection of the sacred lives of those members of our society who toil in the mines to keep our country running efficiently.

H.R. Rep. No. 95-312, at 2 (1977) (emphasis added).

In addition to the transfer of principal authority from Interior to Labor, the Mine Act also substantially revised the general regulatory procedures. Under the Coal Act, health standards and safety standards were addressed separately. As we have noted earlier, the development of health standards specifically involved a two-step process in which the Secretary of HEW developed substantive standards, and the Secretary of Interior promulgated these in a somewhat ministerial fashion. Under the Mine Act, however, health and safety standards both are entrusted to the Secretary of Labor under a single process, although the Secretary of HHS,[12] through NIOSH, has a very significant role in the process. Specifically, the Mine Act directs the Secretary of Labor (acting through MSHA) to "develop, promulgate, and revise as may be appropriate, improved mandatory *health or safety* standards for the protection of life and prevention of injuries in coal or other

_____

[12] At the time the Mine Act was passed, the Department was still known by its former name, HEW. For ease of reading, we shall use its current name, HHS, in our discussion.

23

mines."  Mine Act § 101(a), 30 U.S.C. § 811(a) (emphasis added).[13]  The Mine Act

gives a broad grant of authority to the Secretary of Labor and directs that

"[w]henever . . . upon the basis of information submitted to him in writing by"

interested parties, including the Secretary of HHS, NIOSH, or others, the Secretary

of Labor "determines that a rule should be promulgated," he may act.  *Id.* §

101(a)(1), 30 U.S.C. § 811(a)(1).  However, when he

> receives a recommendation, accompanied by appropriate criteria,
> from [NIOSH] that a rule be promulgated, modified, or revoked, the
> Secretary must, within 60 days after receipt thereof, refer such
> recommendation to an advisory committee . . . , or publish such as a
> proposed rule . . . , or publish in the Federal Register his
> determination not to do so, and his reasons therefor.

*Id.*  Significantly for our purposes, a similar process is set forth in the statute for

the recommendations received of the Secretary of HHS regarding toxic agents

found in mines.[14]  Consistent with the role it plays elsewhere in occupational

---

[13] *See* NIOSH, *National Respiratory Diseases Research Program: 1.2 Legislative Foundations*, http://www.cdc.gov/niosh/nas/rdrp/ch1.2.htm (last visited Dec. 21, 2015) ("Congress has set a clear division between the research function of NIOSH; and the regulatory and enforcement functions of MSHA and OSHA. Although NIOSH works together with MSHA and OSHA to achieve the common goal of protecting worker safety and health, NIOSH simultaneously maintains its unique identity as the sole federal government organization primarily charged to conduct occupational safety and health research.").

[14] Specifically, the statute provides:

> (6)(A) The Secretary [of Labor], in promulgating mandatory standards
> dealing with toxic materials or harmful physical agents under this subsection,
> shall set standards which most adequately assure on the basis of the best available
> evidence that no miner will suffer material impairment of health or functional
> capacity even if such miner has regular exposure to the hazards dealt with by such
> standard for the period of his working life. Development of mandatory standards

(continued . . .)

safety, therefore, NIOSH was given a consultative, rather than regulatory, role under the main provision of the Mine Act addressing the development of health and safety standards.[15]

---

under this subsection shall be based upon research, demonstrations, experiments, and such other information as may be appropriate. In addition to the attainment of the highest degree of health and safety protection for the miner, other considerations shall be the latest available scientific data in the field, the feasibility of the standards, and experience gained under this and other health and safety laws. Whenever practicable, the mandatory health or safety standard promulgated shall be expressed in terms of objective criteria and of the performance desired.

 (B) The Secretary of [HHS], as soon as possible after November 9, 1977, but in no event later than 18 months after such date and on a continuing basis thereafter, shall, for each toxic material or harmful physical agent which is used or found in a mine, determine whether such material or agent is potentially toxic at the concentrations in which it is used or found in a mine. The Secretary of [HHS] shall submit such determinations with respect to such toxic substances or harmful physical agents to the Secretary [of Labor]. Thereafter, the Secretary of [HHS] shall submit to the Secretary [of Labor] all pertinent criteria regarding any such substances determined to be toxic or any such harmful agents as such criteria are developed. Within 60 days after receiving any criteria in accordance with the preceding sentence relating to a toxic material or harmful physical agent which is not adequately covered by a mandatory health or safety standard promulgated under this section, the Secretary [of Labor] shall either appoint an advisory committee to make recommendations with respect to a mandatory health or safety standard covering such material or agent in accordance with paragraph (1), or publish a proposed rule promulgating such a mandatory health or safety standard in accordance with paragraph (2), or shall publish his determination not to do so.

30 U.S.C. § 811(a)(6); *see also* Mine Act § 101(a)(6).

 [15] "Although NIOSH is authorized by 29 U.S.C. § 671(c)(1) to 'develop and establish recommended occupational safety and health standards,' this provision is not part of the Mine Act.  The Mine Act references NIOSH and HHS as providers of information to MSHA, *see* 30 U.S.C. § 811(a)(1) . . . ." *Nat'l Mining Ass'n v. Mine Safety & Health Admin.*, 599 F.3d 662, 671–72 (D.C. Cir. 2010).

25

Perhaps in recognition that many of the Coal Act's initial interim standards were either in force in the industry or already had been superseded with improved standards set by initial regulations, *see generally* 35 Fed. Reg. 5,544, the Mine Act itself made no substantive changes to the Coal Act's *interim* mandatory health standards.[16] Within Title II, therefore, specific duties assigned under the Coal Act to the Secretary of HEW (now HHS) were preserved. Among these are a number of provisions with significance to the present case, including section 202(a), 30 U.S.C. § 842(a), which requires samples of RCD to be taken in the mines "by any device approved by the Secretary [of Labor] and the Secretary of [HHS] and in accordance with such methods, at such locations, at such intervals, and in such manner as the Secretaries shall prescribe in the Federal Register." Additionally, section 202(d) provides that "the Secretary of [HHS] shall establish, in accordance with the provisions of section 101 of this Act, a schedule reducing the average concentration of respirable dust in the mine atmosphere." *See also* 30 U.S.C. § 842(d). Section 202(e), 30 U.S.C. § 842(e) provides that "concentrations of respirable dust in this title mean the average concentration of respirable dust measured with a device approved by the Secretary [of Labor] and the Secretary of [HHS]," and, likewise, section 202(h), 30 U.S.C. § 842(h) gives the Secretaries of

---

[16] Indeed, the only change made to Title II was to eliminate reference to a particular device previously approved to measure average dust concentrations. *See* Pub. L. 95-164, § 202 (amending section 202(e) of the Coal Act).

26

Labor and HHS authority to approve respiratory equipment. Section 202(f), 30 U.S.C. § 842(f) defines the term "average concentration" of RCD, and references a process for measurement that involves, in some measure, both Secretaries. The details of that provision being significant to the present dispute, we shall defer our discussion of them. Suffice it to say that the Mine Act's intent—to draw upon health expertise, to focus on worker safety, and to minimize conflicts generated by federal agencies with an industry-driven mission—are clear. The precise mechanics of the amendments and their success in achieving those goals are an issue that we shall examine as necessary.

### C. Regulatory History Following the Mine Act

Regulatory work under the Mine Act did not revisit immediately the single-shift issue. During the early 1990s, MSHA responded "to concerns about possible tampering with dust samples" by creating a Task Force to review the RCD program. Mine Shift Atmospheric Conditions; Respirable Dust Sample, 63 Fed. Reg. 5,664, 5,667 (Feb. 3, 1998). Out of that review, MSHA developed a spot inspection program that for the first time was based upon samples taken over a single shift or day. "Based on the data from the SIP inspections, the Task Group concluded that MSHA's practice of making noncompliance determinations solely on the average of multiple-sample results did not always result in citations in situations where miners were known to be overexposed to respirable coal mine

27

dust." *Id.* at 5,668. Specifically, multi-sample averaging could mask significant overexposures. "In response to these findings, in November 1991, MSHA decided to permanently adopt the single shift inspection policy initiated during the SIP." *Id.* Thus began a series of attempts at modifying, by administrative processes, the multi-shift sampling regime in an effort "designed to defeat suspected tampering of dust samples by mine operators." *Nat'l Mining Ass'n*, 153 F.3d at 1266. For the first time, in 1994, the Secretaries jointly proposed rescission of the 1972 Joint Finding in the Federal Register. *See* Mine Shift Atmospheric Conditions; Respirable Dust Sample, 59 Fed. Reg. 8,357 (Feb. 18, 1994).[17] The following year, NIOSH issued a Criteria Document[18] recommending a move to single-shift sampling. In 1996, an advisory committee created by the Department of Labor to which the NIOSH recommendation had been referred also recommended single‑shift sampling. *See* 30 U.S.C. §§ 811(a)(1), 812. In 1998, MSHA and NIOSH, armed with the recommendations from NIOSH and the advisory

---

[17] Unlike the present, comprehensive New Dust Rule, the 1994 proposal addressed *only* the Joint Finding.

[18] A "Criteria Document" is the mechanism by which NIOSH fulfills its statutory duty under 30 U.S.C. § 811(a)(6)(B) to "submit to the Secretary [of Labor] all pertinent criteria regarding any . . . substances determined to be toxic" "at the concentrations in which [they are] used or found in a mine."

committee, again jointly proposed to rescind the 1972 Joint Finding, and did rescind it after notice and comment.[19]

In 1998, the National Mining Association challenged the 1998 Joint Finding on the ground that MSHA had failed to comply with the procedural requirements of section 101 of the Mine Act, 30 U.S.C. § 811, and, specifically, the requirements of section 101(a)(6), 30 U.S.C. § 811(a)(6), that MSHA demonstrate feasibility, use of the best available evidence and latest scientific data, and assure that no miner will suffer a material health impairment.  MSHA responded principally by arguing that it was not required to follow section 101, 30 U.S.C. § 811, in order to rescind the Joint Finding, and even if it was, it was not required to follow substantive directions in section 101(a)(6), 30 U.S.C. § 811(a)(6), that were not "procedure-setting."   *Nat'l Mining Ass'n*, 153 F.3d at 1268. We granted the National Mining Association's petition and vacated the 1998 Joint Finding on the basis that MSHA was required to meet all of the requirements of section 101, 30 U.S.C. § 811, in order to rescind the 1972 Joint Finding, but had failed to demonstrate economic feasibility, and, therefore, the rescission was invalid.  *Id.* at 1269.

---

[19] Mine Shift Atmospheric Conditions; Respirable Dust Sample, 63 Fed. Reg. 5,664 (Feb. 3, 1998) ("1998 Joint Finding").  The 1994 proposal was summary in nature.  The 1998 Final Rule was a lengthy publication with the rescission of the Joint Finding as its only substantive change, with the rest of the publication comprising supporting evidence.

29

Following the *National Mining* decision, MSHA and NIOSH proposed jointly to rescind the 1972 Joint Finding. *See* Determination of Concentration of Respirable Coal Mine Dust, 65 Fed. Reg. 42,068 (July 7, 2000). They engaged in notice-and-comment procedures and held public hearings. They twice reopened or extended the period to allow further development of the record, specifically on new technology for testing, the CPDM. The CPDM is a technology intended to replace the testing that had been in place since the original enactment of the Coal Act in 1969, namely, the Coal Mine Dust Personal Sampler Unit ("CMDPSU"). Testing with the CMDPSU required filters to be mailed away by operators to MSHA facilities for testing and introduced a delay of at least a week before samples could be processed. The CPDM, by contrast, takes continuous samples and makes them available to the mine and MSHA in real time, thus preventing possible avenues for tampering and enabling operators to implement additional, responsive air quality measures on an as-needed basis.

This administrative action resulted in the promulgation of two rules. First, in 2010, following notice-and-comment procedures, MSHA promulgated new regulations concerning standards for approval of CPDMs. *See* Coal Mine Dust Sampling Devices, 75 Fed. Reg. 17,512 (Apr. 6, 2010) (codified at 30 C.F.R. part 74). Pursuant to those regulations, NIOSH approved a CPDM by Thermo Fisher

Scientific in 2011. *See* 79 Fed. Reg. at 24,818.[20] Consideration of the proposed rule to rescind the 1972 Joint Finding never was completed.

Also in 2010, MSHA, acting alone, proposed the present, comprehensive New Dust Rule. 75 Fed. Reg. 64,412. It issued an economic analysis to address our concerns in *National Mining* that it had failed to determine the economic feasibility of single-shift sampling. It also opened the record for comment and extended the comment period three times, finally closing it in June 2011. MSHA promulgated its final rule in 2014, with alterations made in response to the comments received to its proposed rule. 79 Fed. Reg. 24,814.

### III. MSHA's Authority to Regulate

With this background in mind, we now turn to the precise issues presented for our review. We first address whether MSHA acted in accordance with the statute when it promulgated the New Dust Rule under its own authority rather than with the joint participation of NIOSH in the promulgation process. At the outset, we note the narrowness of this question: no one maintains that NIOSH has not participated in, or does not agree with, the determinations made by MSHA. Indeed, it is clear that NIOSH has been proposing many of the same revisions for decades. As counsel for the petitioners told us at oral argument, the question here

---

[20] *See infra* note 24.

31

concerns only the formal process of promulgation and NIOSH's failure to sign on the dotted line.

## A.  The Statutory Provisions

In assessing the contention that the New Dust Rule is infirm simply because of the absence of a joint promulgation by the MSHA and NIOSH, we begin with the language of the statutory sections at issue.  Section 101 of the Mine Act provides:

> The Secretary [of Labor] shall by rule in accordance with procedures set forth in this section and in accordance with section 553 of Title 5 (without regard to any reference in such section to sections 556 and 557 of such title), develop, promulgate, and revise as may be appropriate, improved mandatory health or safety standards for the protection of life and prevention of injuries in coal or other mines.

30 U.S.C. § 811(a); *see also* Mine Act § 101(a).  Its following subsections add substantial detail, including significant substantive involvement by the Secretary of HHS and NIOSH.  They do not change, however, the basic structure of regulatory authority and responsibility embodied in subsection (a), which indicates that they belong to the Secretary of Labor alone.

The next section that concerns us is section 202, which provides, in pertinent part:

> **(a) Samples; procedures; transmittal; notice of excess concentration; periodic reports to Secretary [of Labor]; contents**
> Each operator of a coal mine shall take accurate samples of the amount of respirable dust in the mine atmosphere to which each miner in the active workings of such mine is exposed. Such samples shall be

32

taken by any device approved by the Secretary [of Labor] and the Secretary of [HHS] and in accordance with such methods, at such locations, at such intervals, and in such manner as the Secretaries shall prescribe in the Federal Register within sixty days from December 30, 1969 and from time to time thereafter. Such samples shall be transmitted to the Secretary [of Labor] in a manner established by him, and analyzed and recorded by him in a manner that will assure application of the provisions of section 814(i) of this title when the applicable limit on the concentration of respirable dust required to be maintained under this section is exceeded. . . .

. . . .

**(d) Promulgation of new standards; procedures**

Beginning six months after the operative date of this subchapter and from time to time thereafter, the Secretary of [HHS] shall establish, in accordance with the provisions of section 811 of this title, a schedule reducing the average concentration of respirable dust in the mine atmosphere during each shift to which each miner in the active workings is exposed below the levels established in this section to a level of personal exposure which will prevent new incidences of respiratory disease and the further development of such disease in any person. Such schedule shall specify the minimum time necessary to achieve such levels taking into consideration present and future advancements in technology to reach these levels.

**(e) Concentration of respirable dust**

References to concentrations of respirable dust in this subchapter mean the average concentration of respirable dust measured with a device approved by the Secretary [of Labor] and the Secretary of [HHS].

**(f) Average concentration**

For the purpose of this subchapter, the term "average concentration" means a determination which accurately represents the atmospheric conditions with regard to respirable dust to which each miner in the active workings of a mine is exposed (1) as measured, during the 18 month period following December 30, 1969, over a number of continuous production shifts to be determined by the Secretary [of Labor] and the Secretary of [HHS], and (2) as measured

33

thereafter, over a single shift only, unless the Secretary [of Labor] and the Secretary of [HHS] find, in accordance with the provisions of section 811 of this title, that such single shift measurement will not, after applying valid statistical techniques to such measurement, accurately represent such atmospheric conditions during such shift.

30 U.S.C. § 842; *see also* Mine Act § 202.

The question before us is whether these statutory provisions, read in concert, require joint promulgation of the New Dust Rule or permit the approach taken by MSHA in this case—joint participation in development of the substantive standards, but promulgation by MSHA alone.

## B.  The Authority to Impose Single-Shift Sampling

In our previous decision, *National Mining Ass'n*, 153 F.3d 1264, we examined a jointly promulgated regulation by MSHA and NIOSH in which the agencies had tried to accomplish single-shift sampling under section 202(f), 30 U.S.C. § 842(f).  At the time, the challengers claimed that MSHA had violated the statute by failing to undertake the feasibility analysis required by section 101(a)(6), 30 U.S.C. § 811(a)(6).  MSHA took the position that section 101, 30 U.S.C. § 811, *did not* apply in its entirety to the joint finding in section 202, 30 U.S.C. § 842(f). We flatly rejected this position and held, unambiguously, that to regulate on the single-shift issue under section 202(f), 30 U.S.C. § 842(f), "MSHA must follow *all* the provisions of [section 101, 30 U.S.C.] § 811."  *Id.* at 1268 (emphasis added); *accord Sec'y of Labor, MSHA v. Keystone Coal Mining Corp.*, 16 FMSHRC 6,

34

12–13 (1994) (rejecting MSHA's position that § 811 did not apply to § 842(f)).

It is clearly the law of this circuit that the transition to a single-shift sampling regime is a matter to be promulgated by MSHA alone. In holding squarely that this matter is governed by section 101, 30 U.S.C. § 811, *National Mining* forecloses any other result.  Our precedent simply precludes our accepting the petitioners' views that section 202(f), 30 U.S.C. § 842(f), requires, on its face, joint promulgation, that MSHA previously has taken an alternate position on the meaning of this provision,[21] or that what was done by two agencies should not be allowed to be undone by one. "*Stare decisis* is the preferred course because it promotes the evenhanded, predictable, and consistent development of legal principles, fosters reliance on judicial decisions, and contributes to the actual and perceived integrity of the judicial process." *Payne v. Tennessee*, 501 U.S. 808, 827, 111 S. Ct. 2597, 2609 (1991).  Moreover,

> the burden borne by the party advocating the abandonment of an established precedent is greater where [we are] asked to overrule a point of statutory construction.  Considerations of *stare decisis* have special force in the area of statutory interpretation, for here, unlike in the context of constitutional interpretation, the legislative power is implicated, and Congress remains free to alter what we have done.

---

[21] With respect to this particular consideration, we note the irony of the petitioners' position, given that at least some of the petitioners in this case were the ones advocating in the prior case for the full application of section 101, 30 U.S.C. § 811, to section 202, 30 U.S.C. § 842(f).

35

*Patterson v. McLean Credit Union*, 491 U.S. 164, 172–73, 109 S. Ct. 2363, 2370 (1989), *superseded in part on other grounds by statute,* Civil Rights Act of 1991, Pub. L. No. 102-166, 105 Stat. 1071; *see also Halliburton Co. v. Erica P. John Fund, Inc.*, ---U.S.----, 134 S. Ct. 2398, 2411 (2014).

### C.  The Authority to Enact Other Substantive Regulations

We next examine whether the provisions of the New Dust Rule *not* addressed in section 202(f), 30 U.S.C. § 842(f) (i.e., the provisions other than the transition to single−shift sampling) were also subject to the general promulgation rule in section 101, 30 U.S.C. § 811 permitting promulgation by MSHA or whether these provisions must be promulgated by the Secretaries of Labor and of HHS.

The petitioners invite our attention generally to section 202, 30 U.S.C. § 842.  When read in isolation, that section might indeed appear somewhat supportive of their position that a joint promulgation is required with respect to the comprehensive dust regulation topics governed by subsections (a) and (d).  Indeed, subsection 202(a), 30 U.S.C. § 842(a), recites that "the Secretaries shall prescribe in the Federal Register," and section 202(d), 30 U.S.C. § 842(d) provides that "the Secretary of [HHS] shall establish" the respective standards.  Nevertheless, we cannot accept this argument; we have confronted it in *National Mining* and rejected squarely such a non-contextual reading of the entire statutory scheme.

36

In *National Mining*, we focused on section 201 of the Mine Act, 30 U.S.C.

§ 841(a).  It provides:

> The provisions of sections 842 through 846 of this title and the applicable provisions of section 878 of this title shall be interim mandatory health standards applicable to all underground coal mines until superseded in whole or in part by improved mandatory health standards promulgated by the Secretary [of Labor] under the provisions of section 811 of this title, and shall be enforced in the same manner and to the same extent as any mandatory health standard promulgated under the provisions of section 811 of this title. Any orders issued in the enforcement of the interim standards set forth in this subchapter shall be subject to review as provided in subchapter I of this chapter.

30 U.S.C. § 841(a); *see also* Mine Act § 201(a).  Put simply, section 201

designates sections 202 through 206 as "interim mandatory health standards" and

reinforces that their transition to "improved mandatory health standards

promulgated by the Secretary" of Labor will occur under section 101.  *See* 30

U.S.C. §§ 811, 841, 842–846.  This language matches exactly the language in

section 101, 30 U.S.C. § 811, that the Secretary bears the responsibility to

"develop, promulgate, and revise as may be appropriate, improved mandatory

health or safety standards."  *See also* Mine Act § 3(l), 30 U.S.C. § 802(l) (defining

interim mandatory health or safety standards as those appearing between sections

201 and 206, 30 U.S.C. §§ 841–846).

37

Notably, our analysis of section 202(f), 30 U.S.C. § 842(f), in *National Mining* did not turn exclusively on its cross-reference to section 101, 30 U.S.C. § 811. It proceeded *through* section 201, 30 U.S.C. § 841. We said:

> Use of single-shift measurements by MSHA is a health and safety standard. Mandatory health and safety standard is defined, in § 802(l) as "the interim mandatory health or safety standards" between § 841 and § 846. Section 842(f) is the basis for single-shift sampling. Furthermore, § 841(a) refers to §§ 842–846 as "interim mandatory health standards." At a minimum, therefore, § 842(f) is an interim mandatory health standard. § 841(a) continues, however, to say that the interim mandatory health standards of §§ 842–846 are effective "until superseded in whole or in part by improved mandatory health standards." Single-shift sampling supersedes multi-shift sampling, which was based on § 842(f). Single-shift sampling, therefore, is an "improved *mandatory health standard*." According to § 841(a), any new standard must be "promulgated . . . under the provisions of Section 811."

153 F.3d at 1267–68 (citations omitted) (emphasis in orginal). In short, *National Mining* addressed not simply the proper interpretation of § 842(f), but read, as it should, the texts of §§ 811, 841, and 842, as a coherent whole.[22] Indeed, it was by a holistic interpretation of the statutory scheme that the court relied on the plain

---

[22] *See Meredith v. Fed. Mine Safety & Health Review Comm'n*, 177 F.3d 1042, 1055 (D.C. Cir. 1999) ("[W]e next look to the text and structure of the Mine Act as a whole, and to the dual-enforcement regime established thereby. In so doing, we follow the cardinal rule that a statute is to be read as a whole, since the meaning of statutory language, plain or not, depends on context. This shift in perspective is ultimately dispositive; by moving beyond the text of section 105(c) to examine the statutory scheme in which it reposes, the implausibility of the UMWA's proffered construction becomes undeniable." (internal quotation marks omitted) (citations omitted)).

wording of the statute and did not have to proceed beyond the first step of the *Chevron* analysis.

In deciding *National Mining,* an earlier panel of this court correctly perceived section 201, 30 U.S.C. § 841, as the cornerstone provision for discerning Congress's scheme, expressed in the entire statute, for continued progress in achieving mine safety. The panel understood that Congress designated section 202, 30 U.S.C. § 842, as a *transitional* health standard, intended for eventual improvement through the mechanism of section 101, 30 U.S.C. § 811. *See* Mine Act § 201, 30 U.S.C. § 841. This understanding of the statute not only supports our interpretation of section 202(f), 30 U.S.C. § 842(f), but it also makes clear that section 201, 30 U.S.C. § 841, is the fulcrum upon which the entire regulatory structure of the statute turns.

The petitioners nevertheless contend that there is a direct conflict in the statutory language, and the "specific" language of section 202, 30 U.S.C. § 842, referring to both Secretaries controls the "general" language of sections 101 and 201, 30 U.S.C. §§ 811 and 841, designating the Secretary of Labor as the responsible agency head. Respectfully, we believe this interpretation misconstrues the statutory scheme. "[W]hen deciding whether the language is plain, we must read the words 'in their context and with a view to their place in the overall statutory scheme.'" *King v. Burwell*, No. 14-114, slip op. at 9, --- U.S. ---- (2015)

(quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133, 120

S. Ct. 1291, 1301 (2000)).  "Our duty, after all, is 'to construe statutes, not isolated

provisions.'"  *Id.* (quoting *Graham Cty. Soil and Water Conservation Dist. v.

United States ex rel. Wilson*, 559 U.S. 280, 290, 130 S. Ct. 1396, 1404 (2010)).

Accordingly, we conclude that the Mine Act envisions precisely the

approach taken by the relevant agencies here and provides the Secretary of Labor,

acting through MSHA, with broad regulatory authority, sufficient to authorize the

New Dust Rule.

## IV.  Substantive Challenges: The Content of the New Dust Rule

### A.  Standard of Review

In addition to the procedural challenges we already have examined, the

industry plaintiffs also challenge the substance of the New Dust Rule.  We review

the challenges under the Administrative Procedure Act, and shall "hold unlawful

and set aside" any agency action that is "arbitrary, capricious, an abuse of

discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *see*

*also Kennecott Greens Creek Mining Co. v. MSHA*, 476 F.3d 946, 952 (D.C. Cir.

2007).[23]

---

[23] For those of petitioners' challenges based on the statutory language, our review is structured by *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S. Ct. 2778 (1984).  When there is a statutory ambiguity, we move to its second step, which asks whether the agency's interpretation is "arbitrary or capricious in substance." *Mayo Found. for Med. Educ. and Research v. United States*, 562 U.S. 44, 53, 131 S. Ct. 704, 711 (2011).  As

(continued . . .)

[U]nder this standard, a reviewing court may not set aside an agency rule that is rational, based on consideration of the relevant factors and within the scope of the authority delegated to the agency by the statute. . . . The scope of review under the "arbitrary and capricious" standard is narrow and a court is not to substitute its judgment for that of the agency.  Nevertheless, the agency must examine the relevant data and articulate a satisfactory explanation for its action including a "rational connection between the facts found and the choice made."

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42–43,

103 S. Ct. 2856, 2866 (1983); *accord Miami-Dade Cty. v. U.S. E.P.A.*, 529 F.3d

1049, 1064 (11th Cir. 2008).

Many of the challenges raised in the industry briefing invite our attention to

evidence that contradicts the conclusions drawn by MSHA, some within the record

and some external to it.  They do so in large measure by invoking the statutory

requirements found in section 101(a)(6)(A) of the Mine Act, 30 U.S.C.

§ 811(a)(6)(A):

> The Secretary [of Labor], in promulgating mandatory standards dealing with toxic materials or harmful physical agents under this subsection, shall set standards which most adequately assure on the basis of the best available evidence that no miner will suffer material impairment of health or functional capacity even if such miner has regular exposure to the hazards dealt with by such standard for the period of his working life. Development of mandatory standards under this subsection shall be based upon research, demonstrations,

---

the Supreme Court has noted, this second step of *Chevron* is functionally equivalent to traditional arbitrary and capricious review under the APA. *Judulang v. Holder*, --- U.S. ----, 132 S. Ct. 476, 483 n.7 (2011). We therefore make no distinction between the disputes over interpretive ambiguities and more general challenges to the present regulation in our discussion.

41

experiments, and such other information as may be appropriate. In addition to the attainment of the highest degree of health and safety protection for the miner, other considerations shall be the latest available scientific data in the field, the feasibility of the standards, and experience gained under this and other health and safety laws. Whenever practicable, the mandatory health or safety standard promulgated shall be expressed in terms of objective criteria and of the performance desired.

Many of the specific challenges to the content of the New Dust Rule, therefore, focus on whether MSHA considered the "best available evidence" or whether MSHA demonstrated technological or economic feasibility of such standards. These statutory requirements are significant, and, as the litigation history of this regulation has shown, the failure to address them would require us to vacate the rule. *See Nat'l Mining Ass'n*, 153 F.3d at 1267–69 (finding that MSHA's failure to abide by the requirements of § 811(a)(6)(A) in promulgating a rescission of the 1972 Joint Finding on single-shift sampling required vacatur of the rule). Before us, however, is an extremely thorough rulemaking comprising nearly 200 pages. All of the challenges presented were raised by the petitioners or others in the industry as part of the comment period on the proposed rule, *see* Mine Act § 101(d), 30 U.S.C. § 811(d), (providing that "[n]o objection that has not been urged before the Secretary [of Labor] shall be considered by the court, unless the failure or neglect to urge such objection shall be excused for good cause shown"), and, in the main, MSHA addressed the counter-evidence directly in stating its conclusions in the Federal Register.

42

Most importantly, the statutory requirements of section 101(a)(6)(A), 30 U.S.C. § 811(a)(6)(A), have no effect on the standard of review that we apply to this case, which is highly deferential. We do not sit in judgment of what evidence is indeed "best" or whether the proposed rule is "feasible" under the statute. We ask only whether *MSHA*'s conclusions on these matters pass muster under the APA. Furthermore, like our colleagues on the District of Columbia Circuit, we believe it appropriate to "give an extreme degree of deference to the agency when it is evaluating scientific data within its technical expertise." *Kennecott Greens Creek Mining Co.*, 476 F.3d at 954 (internal quotation marks omitted); *see also Marsh v. Oregon Nat. Res. Council*, 490 U.S. 360, 378, 109 S. Ct. 1851, 1861 (1989) ("When specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive."). To do otherwise puts this court in the unenviable—and legally untenable—position of making for itself judgments entrusted by Congress to MSHA. Finally, the Mine Act evinces a clear bias in favor of miner health and safety. The duty to use the best evidence and to consider feasibility are appropriately viewed through this lens and cannot be wielded as counterweight to MSHA's overarching role to protect the life and health of workers in the mining industry. Not only do we decline to

43

balance interests, we acknowledge that when MSHA itself weighs the evidence before it, it does so in light of its congressional mandate.

With the standard of review firmly established and MSHA's mandate in mind, we now turn to the particular substantive challenges raised in the briefing.

### B.  Single-Shift Sampling

Prior to the effective date of the New Dust Rule under review, and consistent with the 1972 Joint Finding favoring multi-shift averaging, the regulations provided:

> Compliance determinations are based on the average concentration of respirable dust measured by five valid respirable dust samples taken by the operator during five consecutive normal production shifts or five normal production shifts worked on consecutive days (multiple-shift samples). Compliance determinations are also based on the average of multiple measurements taken by the MSHA inspector over a single shift (multiple, single-shift samples) or on the average of multiple measurements obtained for the same occupation on multiple days (multiple-shift samples).
>
> Under the existing program, sampling results are often not known to mine operators, miners, and MSHA for at least a week or more after the samples are collected. Due to the delay in receiving sampling results, operators are unable to take timely corrective action to lower dust levels when there are overexposures.

79 Fed. Reg. at 24,817.  In the preamble to the New Dust Rule now under review, MSHA explains the changes to the former multi-shift averaging scheme:

The Secretary [of Labor] has found, in accordance with sections 101 (30 U.S.C. 811) and 202(f)(2) (30 U.S.C. 842(f)(2)) of the Mine Act, that the average concentration of respirable dust to which each miner in the active workings of a coal mine is exposed can be accurately measured over a single shift. Accordingly, the 1972 Joint Finding, by the Secretary of the Interior and the Secretary of [HEW], on the validity of single-shift sampling is rescinded. Final § 72.800 clarifies that MSHA will make a compliance determination based on a single full-shift MSHA inspector sample.

In addition, final § 72.800 clarifies that noncompliance with the respirable dust standard or the applicable respirable dust standard when quartz is present, in accordance with subchapter O, is demonstrated when a single, full-shift measurement taken by MSHA meets or exceeds the applicable [excessive concentration value] . . . . However, as explained elsewhere in this preamble under final § 70.208(e), under the final rule, a noncompliance determination based on a single full-shift sample only applies to MSHA inspector samples and not operator samples. . . .

. . .Under final § 72.800, a noncompliance determination on a single full-shift sample is only based on an MSHA inspector's single full-shift sample and not an operator's single full-shift sample. Noncompliance based on an operator's samples consists of either 2 or 3 operator samples (depending on where the sample is taken) or the average of all operator samples, but not both.

79 Fed. Reg. at 24,932–33 (footnote omitted).

### 1. Statutory and accuracy-related challenges

At the outset of their substantive challenge to the New Dust Rule, the petitioners question MSHA's decision to depart from a regime of multi-shift averaging to single-shift sampling to determine the atmospheric conditions in the mine relative to its RCD limits. The petitioners claim that the single-shift scheme distorts the congressional intent to limit "chronic exposure to excessive RCD, not . . . short-term or episodic exposures." Murray Energy Br. 29. They further

contend that the prior multi-shift scheme "'minimize[d] the variability associated with the result of a single shift sample or several samples on a single shift'" and from "'human and mechanical error.'"  *Id.* at 31 (quoting *Am. Mining Cong. v. Marshall*, 671 F.2d 1251, 1259 (10th Cir. 1982)).  By contrast, the New Dust Rule's focus on the dustiest locations in the mine violates the statutory directive to determine "the atmospheric conditions . . . to which *each* miner . . . is exposed." Mine Act § 202(f), 30 U.S.C. § 842(f) (emphasis added).  Consequently, they contend, the move to single-shift sampling defies the statute's requirement that the RCD samples "accurately represent" the atmospheric conditions in the mine.  *Id.* The industry petitioners further submit that the level of "accuracy" attained by single-shift sampling is insufficient. Indeed, they maintain that the statute permits single-shift sampling only if it meets a dictionary definition of accuracy, i.e., "in exact conformity to truth."  NMA Br. 29 (internal quotation marks omitted).

MSHA responds that the New Dust Rule's approach of measuring over a single shift will, "after applying valid statistical techniques to such measurement, accurately represent such atmospheric conditions during such shift."  Mine Act § 202(f), 30 U.S.C. § 842(f).  In its view, the move to single-shift sampling is the product of reasoned decision-making because it is based on "significant improvements in sampling technology, updated data, and comments and testimony on previous notices" as well as "recommendations contained in both the 1995

46

NIOSH Criteria Document and the 1996 Dust Advisory Committee Report." 79 Fed. Reg. at 24,933.

We cannot accept the petitioners' arguments. First, the petitioners are incorrect in asserting that the statute is concerned *only* with chronic exposure. This subsection, 202(f) of the Mine Act, 30 U.S.C. § 842(f), demonstrates Congress's recognition that cumulative exposure is the product of daily exposure. It therefore explicitly requires an accurate measurement of the actual, real-time conditions in the environment it is measuring—that is, the isolated shift in which the sampling occurs. NMA's argument that the result is a sampling scheme with "no connection to the hazard that MSHA seeks to mitigate," NMA Br. 37, is therefore unfounded. Indeed, Congress intended the former multi-shift sampling scheme to accomplish the same purpose as single-shift sampling. Under the Mine Act, the former approach was considered a temporary accommodation until technology and experience convinced MSHA that an accurate single-shift methodology was feasible. The statute therefore allows multi-shift sampling only when there is a finding that measurement during a particular shift does not accurately describe the conditions *of that particular shift*. *See* Mine Act § 202(f), 30 U.S.C. § 842(f). MSHA's move to single-shift sampling is, therefore, grounded in the statute.

We also see no merit in the petitioners' contention that the single-shift sampling methodology of the New Dust Rule is inherently unreliable and therefore

47

frustrates the purposes of the statutory scheme. In addressing the accuracy of single-shift sampling, MSHA acknowledged in its rulemaking that "all measurements of atmospheric conditions are susceptible to some degree of measurement error." 79 Fed. Reg. at 24,934. In deciding to employ NIOSH's Accuracy Criterion to determine the acceptability of single-shift sampling, it selected a rule that requires samples to be within 25 percent of the actual sample 95 percent of the time. In making this decision, MSHA noted that the Accuracy Criterion "is relevant and widely recognized and accepted in the occupational health professions as providing acceptable limits for industrial hygiene measurements." *Id.* To support its decision, MSHA relied upon NIOSH studies, which showed that, using *either* available monitoring technologies (the CPDM or the CMDPSU),[24] single-shift sampling conforms to the Accuracy Criterion.[25]

---

[24] "Since the 1970s, mine operators and MSHA inspectors have used the approved coal mine dust personal sampler unit (CMDPSU) to determine the concentration of respirable dust in coal mine atmospheres." 79 Fed. Reg. at 24,859. The CMDPSU is a pump unit, worn or carried by the miner for 8 hours or his entire shift, whichever is shorter. Through its internal mechanism, nonrespirable particles are removed, and respirable dust particles are deposited on the filter surface. The collection filter is capped at the end of sampling "and sent to MSHA for processing, where it is disassembled to remove the filter capsule for weighing under controlled conditions to determine the amount of dust that was collected on the filter." *Id.* at 24,860. The analysis took a week or more, preventing mine operators from putting in place effective controls when dust exceeded the applicable limits.

As described in the preamble to the present rule, the principal goal in the development of the CPDM technology was "[t]he ability to continuously monitor and give mine operators and miners real-time feedback on dust concentrations in the work environment." *Id.* MSHA set forth to support the development of "a new type of personal dust monitor that would provide a direct measurement of respirable coal mine dust levels in the mine atmosphere on a real-time

(continued . . .)

In evaluating the industry petitioners' specific objections, we first must note that the decision to use the Accuracy Criterion to evaluate the technology is not properly challenged in the present case. The regulation establishing its use to evaluate CPDM technology, 30 C.F.R. § 74.8, was not challenged within sixty days of its promulgation in 2010, as required for this court to have jurisdiction. *See* Mine Act § 101(d), 30 U.S.C. § 811(d). Even if implementation of the

---

basis, unlike the existing sampling system used since 1970." *Id.* Unlike its predecessor, the CPDM achieves that goal:

> The CPDM is a respirable dust sampler and gravimetric analysis device that is incorporated into the miner's cap lamp battery case as a single package located on the belt. The device represents the first major advance in dust sampling technology in more than 30 years.

Respirable Coal Mine Dust: Continuous Personal Dust Monitor (CPDM), 74 Fed. Reg. 52,708, 52,709 (Oct. 14, 2009). Mechanically, the core of the device is an inertial mass sensor called the TEOM, a hollow, tapered tube "which is clamped at the base and free to oscillate at its narrow or free end on which the collection filter is mounted." *Id.* Electronics near the tapered element cause it to oscillate at its natural frequency when free of dust. Dust entering the device is first filtered to remove oversized, nonrespirable particles. RCD continues to the filter mounted on the free end of the tapered element, where it is captured. Once affixed to the filter, the particles change the frequency of oscillation of the TEOM in direct proportion to their mass. Critically, that change in oscillation is processed and analyzed *internal to* the device, and it continuously and immediately calculates and displays:

> (1) The respirable dust concentration calculated at distinct 30-minute intervals; (2) the average respirable dust exposure from the beginning of the shift; and, (3) the percent of exposure limit. Through the display, both the mine operator and miners wearing the device have the ability for the first time to gauge respirable dust exposures, as well as the effectiveness of corrective actions taken by authorized personnel to reduce a miner's exposure.

*Id.*

[25] *See, e.g.*, Appendix at V-BKG-55 at 1005, II-BKG-8 at 20.

49

Accuracy Criterion were properly before us, we only would have to determine that MSHA's determination was a reasonable one worthy of our deference.  The statute does not require technology with a zero tolerance for error—an impossible standard—as a prerequisite to the adoption of single-shift sampling.  Indeed, it expresses a *preference* for single-shift sampling.  Mine Act § 202(f), 30 U.S.C. § 842(f) (identifying single-shift sampling as the default rule).  MSHA was justified in determining that technology that satisfies the Criterion is sufficiently accurate to sustain a move to single-shift sampling.[26]

The industry petitioners also maintain that the abandonment of multi-shift sampling introduces an element of variability into the sampling methodology that eviscerates the statutory command for accuracy.  By implementing the new scheme without the check provided by multi-shift sampling, reliance on samples taken from the dustiest locations is, they contend, also unfaithful to the statutory command to evaluate the conditions "to which each miner in the active workings of the mine is exposed," Mine Act § 202(f), 30 U.S.C. § 842(f).  *See* Murray Energy Br. 31–32.  To support this argument, the petitioners invite our attention to *American Mining Congress v. Marshall*, 671 F.2d 1251 (10th Cir. 1982), in which

---

[26] The use of the Accuracy Criterion and its margin of error is not, as the petitioners contend, an admission that the measurements taken are inaccurate.  It is not a "drastic[] re‑defin[ition]," NMA Br. 38, of the statutory term "accurately."  It is an accepted methodology, used successfully in other occupational health contexts.  79 Fed. Reg. at 24,934.

our colleagues on the Tenth Circuit evaluated area sampling, a program designed to sample near dust-generating sources away from the working sections of the mine. In their view, the court in that case approved of area sampling *only because* MSHA employed multi-shift sampling. We cannot accept such an interpretation of *American Mining Congress*. The petitioners in that case challenged the prior 1980 Dust Rule on numerous bases. In considering those myriad challenges, the court *did* evaluate whether MSHA had sufficiently accounted for variability inherent in the chosen sampling methodology. The court relied in part on its conclusion that a multi-shift scheme "minimizes the variability associated with the result of a single sample." *Id.* at 1259. This case hardly stands for the proposition that multi-shift sampling was *required* to account for variability. It merely states that *MSHA's response* to the "conflicting evidence" about variability, which included persistence in the use of multi-shift sampling, was adequate to address any variability issues. *Id.* Indeed, the court's remaining analysis undercuts any claim that it was a necessary response. In soundly rejecting the petitioners' suggestion that citations should not issue when the measurements were within the range of sampling error from the statutory standard, the court stated that such a rule

> would resolve the remaining variability solely in favor of mine operators, to the detriment of the congressional purpose to protect miners from black lung disease. *Congress has not mandated any accounting for variability and has given the Secretary broad discretion in enforcing the respirable dust standard.* The Secretary

51

has not abused his discretion by refusing to put the risk of the
remaining error on miners.

*Id.* (emphasis added). Moreover, this discussion of potential issues with variability
was *entirely separate* from the section addressing new additions to the existing
sampling program, which found that MSHA's judgment in favor of area sampling
was reasonable despite the fact that it might overestimate a given miner's
exposure:

> The Secretary has demonstrated a rational basis for the designated
> area sampling program: if the atmosphere in the area of a known dust
> generation source is in compliance with the statutory standard, then it
> can safely be assumed that all miners are protected from overexposure
> to respirable dust. This assumption is justified since no one individual
> constantly works next to an outby[27] dust generation source over the
> course of an entire shift.

*Id.* at 1256.

Sampling in the dustiest locations[28] is and has been the applicable rule for
decades and cannot seriously be challenged here.  In any event, even when
considered in conjunction with a new single-shift sampling scheme, we must
conclude that MSHA has supplied for its action a reasoned basis consistent with

---

[27] The program under review in the Tenth Circuit case included not simply designated occupation sampling, but a new "designated area sampling program in the non-working sections of the mine," specifically, a program that responded to "studies showing that dust generated by sources outby (away from) the working face poses a significant health hazard to miners." *Am. Mining Cong. v. Marshall*, 671 F.2d 1251, 1254 (10th Cir. 1982) (internal quotation marks omitted).

[28] *See supra* note 3; *see also Am. Mining Cong.*, 671 F.2d 1251.

52

congressional intent.  In the context of the present rulemaking, MSHA has

responded that the dustiest locations are indeed areas where miners work and

where they travel, and that all miners are thereby protected from excessive

concentrations. MSHA's response to comments submitted during the rulemaking

reads, in relevant part:

> While area sampling does not show a particular miner's dust exposure, the area sampling results will show whether miners are exposed to excessive dust concentrations. The objective of area sampling is to control the concentration of respirable dust to which miners are exposed in the workplace. In *American Mining Congress v. Secretary of Labor*, 671 F.2d 1251 (10th Cir. 1982), the Court found that area sampling was reasonable and consistent with the Mine Act.

> If placed in a fixed location, the CPDM will provide an accurate measurement of the respirable dust in the atmosphere where miners work or travel. In addition, it will provide immediate information to the miners working in that location so that the mine operator could make immediate adjustments in controls in relation to dust sources to reduce dust generation or suppress, dilute, divert, or capture the generated dust. Compared with administrative controls or respirators, well-designed engineering controls provide consistent and reliable protection to all workers because the controls are less dependent on individual human performance, supervision, or intervention to function as intended. Area sampling with the CPDM will also provide information on miners' exposure in areas with the highest concentration of dust. This will give the mine operator and MSHA valuable data to pinpoint areas in need of improvement.

79 Fed. Reg. at 24,886.

In light of the congressional purpose and the lack of any statutory command

to the contrary, it is permissible for MSHA to select a sampling scheme that

resolves ambiguities in dust levels resulting from sampling issues in favor of

53

miners' health, even if it results in a scheme that is more aggressive in its demands on the industry. *See Am. Mining Cong.*, 671 F.2d at 1256. MSHA's conclusions on this issue are reasoned, take into account prior court decisions, and serve the practical purpose of allowing immediate corrective measures in mine trouble-spots.

## 2. Feasibility of single-shift sampling

The petitioners next assert that MSHA failed to demonstrate that its move to single-shift sampling is technologically feasible. *See* NMA Br. 34–39. All of these arguments can be reduced to a simple assertion by the petitioners that single-shift sampling produces inaccurate results and will burden the industry with faulty data suggesting overexposure. We already have rejected the petitioners' challenge to the extent that it rests on adoption of the Accuracy Criterion and do not repeat that analysis here. With respect to the remainder of the "accuracy"-related challenges to single-shift sampling, MSHA readily acknowledges that there is significant variability in coal dust concentration at places in the mine, and there are measurement differences that occur depending on the placement of the sampling device on the miner's body, his orientation with respect to dust-producing activities, and the like. If the device encounters different levels of respirable dust, the *miner himself* encounters variable concentrations of RCD as well.[29]

---

[29] The National Mining petitioners also claim that, through its adoption of ECVs, MSHA "recognizes the error" in single-shift sampling and attempts to compensate for it with "limited"

(continued . . .)

54

There is neither a "perfect" or "true" concentration of dust in a particular area of the mine, nor is there is a perfect sampling method. *See Am. Mining Cong.*, 671 F.2d at 1256 ("[M]easurement error is inherent in all sampling, [so] the very fact that Congress authorized a sampling program indicates that it intended some error to be tolerated in the enforcement of the dust standard."); *see also id.* ("Since there is no perfect sampling method, the Secretary has discretion to adopt any sampling method that approximates exposure with reasonable accuracy. The Secretary is not required to impose an arguably superior sampling method as long as the one he imposes is reasonably calculated to prevent excessive exposure to respirable dust."). MSHA's rule reflects knowledge of this imperfection, as well as a detailed understanding of improvements—both technological and in the standards for collection by operators—that make single-shift sampling sufficiently "accurate" as to satisfy the statutory standard. *See* 79 Fed. Reg. at 24,935–36.[30]

---

but statistically insufficient "increases in applicable exposure limits." NMA Br. 38–39. MSHA responds that the ECVs are intended to compensate for inaccuracies inherent in any measurement, regardless of whether it is from a single or multiple shifts or using the older or newer device. *See* MSHA Br. 50–51.

[30] The National Mining petitioners also state that "MSHA dared not base its feasibility analysis on single-shift measurements," but "tried to support its rule with hypotheticals and analysis of *averages* that smooth over the variability of underlying single-shift samples. MSHA's analysis averaged thousands of historical sample results, smoothing out inaccurate peak results." NMA Br. 37 (emphasis in original) (citations omitted). But this claim is belied by the very analysis that they cite in the preamble, in which MSHA states that, "[a]lthough some commenters" had claimed the feasibility analysis was based exclusively on "historical averages," it was instead based on "the mean (or average) concentrations, *the average deviation of sample*

(continued . . .)

## C. Technological Feasibility of Other Major Provisions of the New Dust Rule

The petitioners next raise a host of other feasibility challenges.  Before addressing each of these, we call to mind the counsel of the Supreme Court when it interpreted a nearly identical provision of the OSH Act. On that occasion, the Supreme Court noted that when a statute commands that the agency consider the feasibility of its regulations, the bar should not be set prohibitively high: "feasible means capable of being done, executed, or effected."  *Am. Textile Mfrs. Inst., Inc., v. Donovan*, 452 U.S. 490, 508–09, 101 S. Ct. 2478, 2490 (1981) (internal quotation marks omitted).  A feasibility determination decidedly does *not* require the agency to engage in a cost-benefit analysis. Where the statute directs the agency to assure employee safety "to the extent feasible," "Congress itself defined the basic relationship between costs and benefits, by placing the 'benefit' of worker health above all other considerations save those making attainment of this 'benefit' unachievable."  *See id.* at 509, 101 S. Ct. at 2490.  Our colleagues in the District of Columbia Circuit similarly have said,

> [g]iven that feasibility determinations involve complex judgments about science and technology, our standard of review is deferential:

---

*concentrations from standards, and the percentage of observations above the standard.*" 79 Fed. Reg. at 24,868 (emphasis added).  That is, it is not the case that MSHA proceeded with averages to "smooth over," NMA Br. 37, the variability—MSHA explicitly used averages, *along with* the magnitude and frequency of variations in its calculations.

56

the agency is not obliged to provide detailed solutions to every engineering problem, but only to give plausible reasons for its belief that the industry will be able to solve those problems in the time remaining.

*Kennecott Greens Creek Mining Co.*, 476 F.3d at 957 (internal quotation marks omitted). With this approach in mind, we now turn to the petitioners' specific objections.

### 1.  Mandatory use of the CPDM

Petitioners assert that the transition to the CPDM is not feasible.  They contend that MSHA ignored record evidence of the device's high malfunction rate, failed to consider that its measurement methodology does not protect against inaccuracies due to oversized particles which are not respirable, failed to consider that it is not capable of silica measurement, used inaccurate assumptions to calculate its availability timeline to the industry, and reached incorrect conclusions about the ability of miners to wear the device without impeding their work.  Each of these objections was raised before MSHA during the comment period of the rulemaking process, and MSHA responded to them on the merits in the preamble of the final rule.  As we have noted earlier, in our review, we do not reweigh the evidence before MSHA; we simply assess whether MSHA's position, in light of the evidence before it, meets a threshold of reason such that it cannot be deemed arbitrary.  *See Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43, 103 S. Ct. at 2866 ("The scope of review under the 'arbitrary and capricious' standard is narrow and a court

57

is not to substitute its judgment for that of the agency."); *id.* at 43, 103 S. Ct. at 2866–67 (noting that the reviewing court must determine whether "the agency . . . examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made" rather than exhibiting "a clear error of judgment" (internal quotation marks omitted)).

We also note that, although the petitioners have questioned whether NIOSH had the requisite degree of *formal* involvement in the rulemaking process required by the statute, *see supra* section III (evaluating claims that HHS must co-promulgate rules), they cannot seriously challenge that MSHA acted consistently with the advice of NIOSH when making its substantive determinations. Indeed, NIOSH was directly involved both in the prior rulemaking on the CPDM technology and the actual, currently marketed commercial CPDM device. *See generally* 75 Fed. Reg. 17,512; *see supra* pp. 30–31. Moreover, in the course of the present rulemaking, NIOSH's comments on the CPDM, included in the record, responded directly to many of the objections raised by the petitioners in their comments on the proposed rule. With this consideration in mind, we now turn to petitioners' specific objections.

### a. Accuracy challenges to the CPDM

The petitioners assert that the devices fail to satisfy the NIOSH Accuracy Criterion more than 40 percent of the time. NIOSH reviewed the data relied on by petitioners on this issue and noted that its source was a *single* mine operator and that it was based on only 955 individual measurements. By contrast, NIOSH's own data "analyzed samples that were statistically representative of the nation's underground coal mining industry" and had been "collected by MSHA inspectors at approximately 20 percent of active mechanized mining units." 79 Fed. Reg. at 24,863. NIOSH's comparison of the data sets, accepted by MSHA, notes that "[s]tatistically representative samples are critical for correctly estimating the bias of the CPDM relative to the gravimetric method of the CMDPSU. Bias may not be properly estimated from studies conducted in a limited number of mines or regions, regardless of the number of samples obtained." *Id.*

Moreover, the objection is based on the errant use of the Accuracy Criterion to evaluate *field samples*, as opposed to laboratory testing of devices—the purpose for which the Criterion was designed and its use intended. In field sample testing, "[t]he variability reported by the commenter was primarily due to large sample variability, which was due to uncontrolled variables known to exist in field samples, even when two identical samplers were placed side-by-side." *Id.* Among the causes of that variability were "significant dust gradients known to exist,

59

sampler inlet location differences, and the nature of mine ventilation." *Id.* These

are real-time variations in the dust measured that can be *controlled in laboratory*

*testing*. The error of using field tests to assess device accuracy is laid plain by this

data: the complained variations are not evidence of imprecise or unreproducible

measurements due to characteristics *of the device*; they are actual variations in

conditions, which are variable inch by inch in a mine. Viewed in this light, the

petitioners are objecting to variability inherent in a sampling regime of any kind—

a position flatly rejected by a statute that *requires* a sampling program. MSHA

summarized its position on these varying analyses when it concluded, "[t]hrough

years of work, NIOSH has demonstrated that the CPDM is an accurate instrument

that meets the NIOSH Accuracy Criterion and, therefore, can be used as a

compliance instrument." *Id.*[31]

---

[31] Relatedly, NMA objects that "the CPDMs not only produce results that vary significantly from the current sampler, but they also produce highly variable results from unit to unit." NMA Br. 41. NMA provides only a general citation, without specificity, to a forty-nine-page analysis by the NMA itself entitled "Analysis of MSHA Coal Dust Sampling Data Base [sic] & The Impact Of The MSHA Proposed Rule," *see* I-COMM-58-9. It is not our role to review it independently to determine if anything contained in it supports the stated proposition. This material was in the record before MSHA. As we already have noted, MSHA did not abuse its discretion in relying on NIOSH studies that demonstrate the accuracy of the device under appropriate testing conditions.

The petitioners also claim that MSHA attempted to justify the accuracy based on averages of samples taken with the two devices. *See* NMA Br. at 41–42. But the cited portions of the preamble do not support this statement. Instead, after indicating that the averages from the devices were nearly identical, MSHA continues "that there was no statistically significant difference between *the data sets*, and that the bias between" the two devices "is zero." 79 Fed. Reg. at 24,863 (emphasis added). It goes on to explain the mathematical analysis of the data sets in lognormal distribution and notes that "a simple arithmetic average cannot be calculated," so

(continued . . .)

### b. Assumptions underlying MSHA data and requests to supplement the record before the court

In a somewhat related challenge, the petitioners claim that, because of the variability present in sampling, operators would be required to "overengineer" their mines to ensure against sampling readings that, because of measurement inaccuracy, reflect noncompliance. Murray Br. 43. They contend that MSHA's data is based on a faulty assumption that the mines will only make the reductions necessary to achieve compliance, but will go no further. Accordingly, they contend that the data underlying the feasibility is itself skewed in MSHA's favor.

The petitioners' analysis is based, in substantial part, on materials that were not before MSHA; they urge us, nevertheless, to take judicial notice of them. "[T]he general rule, applicable across the board to judicial review of administrative action . . . is that the court may not go outside the administrative record." *Najjar v. Ashcroft*, 257 F.3d 1262, 1278 (11th Cir. 2001) (internal quotation marks omitted). Accordingly, "[w]hen directly reviewing an agency decision or regulation, a court does not consider any evidence that was not in the record before the agency at the time that it made the decision or promulgated the regulation." *United States v. Guthrie*, 50 F.3d 936, 944 (11th Cir. 1995). Though "certain circumstances may

---

"[t]he appropriate method is to average the logarithms of the numbers, followed by un-transformation of the logarithmic averages" and so on. *Id.*

61

justify going beyond the administrative record," we are "not generally empowered to do so." *See Preserve Endangered Areas of Cobb's History, Inc. v. United States Army Corps of Eng'rs*, 87 F.3d 1242, 1246 (11th Cir. 1996) (internal quotation marks omitted). We have acknowledged that various factors could be considered in determining the propriety of reviewing extra-record material on review of an agency rule, *id.* at 1246 n.1; in practice, however, we generally have focused pointedly on whether the petitioners have made "a strong showing of bad faith or improper behavior by the agency." *See Alabama-Tombigbee Rivers Coalition v. Kempthorne*, 477 F.3d 1250, 1262 (11th Cir. 2007) (internal quotation marks omitted). Because we conclude that the allegations of "bad faith" made by the petitioners in their submissions are not supported,[32] we deny the motion for judicial notice and confine our substantive review to the record as it stood before MSHA.[33]

---

[32] Murray Energy's allegation of bad faith is based principally on MSHA's failure to reference the findings of a 1996 study it commissioned on the development of a fixed-site, machine-mounted sampling device. Murray Energy contends that MSHA made an improper assumption in its calculations, and this 1996 study provides the data that undermines the assumption. Regardless of the value of the data included in that study, Murray Energy's objection to MSHA's failure to include it cannot reasonably support expansion of the record here. The assumption to which Murray Energy refers was plainly stated in the materials accompanying the *proposed* rule as well as the final rule, and there is simply no persuasive justification for allowing the petitioners to rest *now* on a decades-old study, available to them during notice-and-comment, on which they failed to rely.

[33] We note that NMA has made a separate motion for judicial notice of a host of documents. Many of them are legal authorities, and with respect to these we note that the procedural vehicle of a motion is unnecessary; we can and do take account of all relevant authorities in determining the content of the law. NMA also submits, however, substantive evidentiary materials, including a study commissioned for Kentucky's state-level energy agency, an affidavit filed in support of the brief which provides further analysis of sampling data, and a

(continued . . .)

We further note, in any event, that MSHA has persuasively demonstrated that the assumption with which the petitioners take issue was made in the context of, and confined to, an entirely separate conclusion—whether the rule will achieve the intended health benefits for miners—not the issue of feasibility on which the petitioners' argument is based.  Accordingly, we see no basis in this objection to find MSHA's action to have been arbitrary.

### c. Malfunction rate of the CPDM

The petitioners also submit that CPDMs have a high malfunction rate, with 35 percent of units requiring a return to the manufacturer for repair, and 12 percent returned more than once.  After examining the data submitted by the petitioners, NIOSH responded that the data lacked "an appropriate experimental protocol to control" critical variables and reflected a misunderstanding by operators of the

---

comment from the Chamber of Commerce in a separate rulemaking proceeding.  With respect to these factual materials, NMA asserts that their consideration is necessary to ensure that MSHA considered all relevant material in formulating its rule.  *See Preserve Endangered Areas of Cobb's History, Inc. v. United States Army Corps of Eng'rs*, 87 F.3d 1242, 1246 (11th Cir. 1996).  Whatever the outer limits of this exception to the general rule that review is on the administrative record alone, it is plainly not an invitation to leave the record open indefinitely.  The gravamen of NMA's request is to place before us materials not raised during agency proceedings on the justification that MSHA did not, in a complete notice-and-comment rulemaking, reference, *on its own initiative*, additional materials that potentially could undermine its position.  We do not require MSHA to demonstrate the absence of any additional relevant materials in order to set about the task of regulating required of it by Congress.  If this material supported the petitioners' position below, they had an obligation to present it.

import of "error" messages.  79 Fed. Reg. at 24,863–64.  MSHA describes

NIOSH's response to the data clearly:

> [T]hese commenters misunderstood the CPDM error messages
> received during their testing, believing that the messages indicated
> failure of the CPDM.  The CPDM, as currently programmed, monitors
> its performance during sampling and registers any status conditions
> (errors) logged during the sample run.  These messages are not
> indicative of a failure of the CPDM, rather they provide the user with
> valuable constructive feedback in real-time concerning sample
> validity.  The frequency and type of these error messages are logged
> during sample collection.  They will be used by MSHA to determine
> whether samples are valid or should be voided.

*Id.*

In response, in its brief, NMA states that MSHA's explanation, that "error"

is a status code, rather than an indication of device failure, "does nothing to change

the fact that CPDMs appear to malfunction 200 out of every 1,000 times."  NMA

Br. 42. But that is *exactly* what MSHA's explanation resolves.  The error codes do

not indicate failure, therefore, failure rates based on error codes are per se invalid.

To the extent that NMA is arguing that the devices give the *appearance* of failure,

MSHA's explanation should suffice to assure operators that they are not, indeed,

failing.

MSHA further noted that "[g]iven the limited data set, including error

messages, from only five mines cited by the commenters as evidence of CPDM

failure, both NIOSH and MSHA consider the cited failure rate of 41 errors per

1,000 hours to be invalid.  The NIOSH published data remains the most

64

appropriate data set to assess the failure rate of the CPDM." 79 Fed. Reg. at 24,864. According to that data, the failure rate was lower by "an order of magnitude," at only 4.75 per 1,000 hours. *Id.* Moreover, repair rates had improved quarter-to-quarter since the devices were first used in mine settings, and "repair rates are expected to improve in general due to the quality control systems required for certification" of the devices as well as "the actions taken by the manufacturer to address reported field performance." *Id.* Before this court, the petitioners simply restate the data that they provided to MSHA in their comments, without addressing any of MSHA's reasons for rejecting that data in favor of the published results of NIOSH studies. Accordingly, the petitioners ask us to reweigh the evidence, an option that is simply not available to us under our narrow standard of review.

The petitioners also contend that later laboratory analysis of samples was a critical "analytical safeguard[] against inaccurate measurements," including those caused by oversized, non-respirable coal dust. NMA Br. 43. MSHA unapologetically abandoned later analysis in favor of real-time analysis for multiple reasoned bases, including the value of real-time information in employing secondary air-quality controls and the elimination of the possibility of operator tampering. Moreover, the device's internal controls allow for the same safeguards, in part by issuing status (formerly "error") codes to indicate oversized particles,

65

etc.  The petitioners cite no evidence that these internal device protections against measurement of oversized particles are insufficient to correct the issue they identify.

### d. Performance at varying temperatures and humidities

The petitioners next object that data showed that the CPDM became inaccurate at high temperatures and humidities.  MSHA rejected this data.  The preamble noted that "[t]he differences" cited by the commenter "are below the minimum detection limit of the commercial CPDM . . . . Therefore, the commenter's conclusions, which are based on these test results, are inaccurate." *Id.* at 24,864.  Moreover, it was unclear whether the commenter had used the "user-selected temperature operating range to optimize performance," and without that information, the validity of the data could not be assessed.  *Id.*  Further, the objecting commenter had used an "outdated" Department of Defense testing procedure "not designed to evaluate the accuracy and precision of airborne dust sampling instruments." *Id.*  Finally, the testing involved talc as a proxy for RCD, which MSHA states is "not representative of respirable coal mine dust." *Id.* Again, the petitioners' brief does not endeavor to undermine MSHA's reasons for

rejecting the data, instead simply citing the data and claiming that MSHA "disregarded [the] evidence." NMA Br. 41.[34]

On all of these questions regarding the implementation of the CPDM device, the record simply does not support the petitioners' assertion that MSHA "disregarded evidence" in reaching its conclusions about the CPDM's accuracy. Instead, MSHA's conclusions, which essentially echo NIOSH's statistically valid analyses, address head-on the contrary data and explain the flaws that make it less than trustworthy. Its conclusions are supported both by data and by reasoned explanations that the petitioners have failed to challenge in substance. More to the point, the petitioners' arguments relying on their previously submitted data, with no attempt to address the deficiencies in it identified by MSHA, provide us with no reasoned basis for finding that MSHA acted in excess of its broad statutory discretion.

_____

[34] The petitioners also assert failure of the CPDM because of certain electromagnetic interference. However, MSHA asserts that the commercial CPDM satisfies the existing standards for interference set in 30 C.F.R. § 74.7(f). Further, MSHA stated in the preamble that additional standards regarding radio frequency and electro-static discharge interference will be incorporated into part 74, the CPDM has been redesigned to satisfy those new standards, and independent lab testing will confirm it before its use is mandatory. *See* 79 Fed. Reg. at 24,864–65. We must conclude that MSHA has taken note of the interference objection and acted within its discretion to address it.

### e. CPDM as an impediment to miner's ability to perform work

The petitioners also object that use of the device is not feasible because miners cannot wear the device "without impeding their ability to perform their work safely and effectively." *See* NMA Br. 45 n.10 (quoting 30 C.F.R. § 74.7(a)). MSHA responds that the petitioners' analyses are based on the pre-commercial model, and NIOSH's own analysis of the improved commercial model reaches opposite conclusions, including that the device "adds no more than eight ounces to the total weight carried by the miner." MSHA Br. 59 (citing 79 Fed. Reg. at 24,866). MSHA also cites planned ergonomic improvement from the manufacturer, including the possible reduction of weight. *Id.* It also notes that, although the *proposed* rule required *continuous* monitoring, the New Dust Rule requires only fifteen samples on consecutive normal production shifts per quarter. Accordingly, the petitioners have not come forward with data that demonstrates a performance issue when the device, in its current commercial iteration, is worn on the more limited schedule prescribed in the New Dust Rule.

### f. Availability of the CPDM

The petitioners next object that the device will not be available in time for implementation of the rule in February 2016. NMA claims that MSHA "entirely failed to consider" the availability issue, and therefore its implementation schedule is arbitrary and capricious. NMA Br. 46 (internal quotation marks omitted).

68

However, again, the record does not support this assertion. MSHA asserts that it

developed the eighteen-month phase-in in consultation with the manufacturer, but

noted that

> if MSHA determines that there are logistical or feasibility issues
> concerning availability of the CPDM, MSHA will publish a notice in
> the Federal Register to continue to use an approved CMDPSU to
> conduct quarterly sampling.  In addition, assuming no technological
> issues arise concerning the use and manufacture of CPDMs, and
> depending on manufacturer projections, if CPDMs are not available in
> sufficient quantities, MSHA will accept, as good faith evidence of
> compliance with the final rule, a valid, bona fide, written purchase
> order with a firm delivery date for the CPDMs.

79 Fed. Reg. at 24,884.  Not only has MSHA considered availability and given a

timeline based on available evidence, it also already has developed a contingency

plan.  We have no basis for finding this approach to the question arbitrary.

### 2.  The silica standards[35]

Shifting their focus from the CPDM, the petitioners challenge whether

MSHA has demonstrated the feasibility of what they claim are new silica PEL

(permissible exposure limit) and silica-based, reduced RCD limits.  *See* NMA Br.

46.  MSHA points out, however, that the new rule does not establish any new silica

---

[35] The regulations use the term "quartz," although the parties' briefs generally prefer the term "silica."  According to MSHA's website, "The terms 'crystalline silica' and 'quartz' refer to the same thing. Quartz is a natural constituent of the earth's crust and is not chemically combined with any other substance."  MSHA, MSHA's Occupational Illness and Injury Prevention Program, Health Topic: Silica Exposure of Surface Coal Miners, http://www.msha.gov/illness_prevention/healthtopics/hhicc01.htm (last visited December 27, 2015).  For the sake of consistency, we shall adopt the parties' terminology.

69

PEL. *See* 79 Fed. Reg. at 24,866, 24,882. Instead, it states that its new rule merely applies the rule of existing 30 C.F.R. § 70.101, which has consistently limited a miner's total exposure to respirable silica to 0.1 mg/m$^3$. Under the existing rule, this limit was achieved principally by a requirement that the mine atmosphere contain less than 5% silica (because 5% of 2.0 mg/m$^3$—the existing overall RCD limit—is 0.1 mg/m$^3$). When, under the existing rule, the mine atmosphere contained *greater* than 5% silica, the overall RCD limit was reduced in proportion to the silica content such that the resulting RCD limit assured a total exposure less than the 0.1 mg/m$^3$ limit. The new rule maintains the *identical* limit on respirable silica of 0.1 mg/m$^3$, but because of the new RCD limits and their variations,[36] the rule is now phrased in terms of the 0.1 mg/m$^3$ limit rather than the 5% threshold.[37]

---

[36] The overall RCD limits imposed by the rule are somewhat generically expressed as 1.5 mg/m$^3$, but are actually variable to a degree based on certain conditions. For example, in the case of a miner who has evidence of CWP, the rules require that operators allow him to work only in a mine atmosphere where the RCD concentration is, beginning August 1, 2016, no higher than 0.5 mg/m$^3$. *See* 30 C.F.R. § 90.100(b). Likewise, the same lower standard applies, beginning in August 2016, "within 200 feet outby the working faces of each section in the intake airways." 30 C.F.R. § 70.100(b)(2).

[37] The existing rule states:

> When the respirable dust in the mine atmosphere of the active workings contains more than 5 percent quartz, the operator shall continuously maintain the average concentration of respirable dust in the mine atmosphere during each shift to which each miner in the active workings is exposed at or below a concentration of respirable dust, expressed in milligrams per cubic meter of air as measured with an approved sampling device and in terms of an equivalent concentration determined in accordance with § 70.206 (Approved sampling devices; equivalent concentrations), computed by dividing the percent of quartz into the number 10.

(continued . . .)

Accordingly, MSHA has a reasoned basis for concluding that the silica standard does not create a new limit.

The petitioners also object to the silica standard on feasibility, given that the new CPDM device does not measure silica. However, it is worth emphasizing that *neither* the newer CPDM nor the prior CMDPSU are capable of silica measurements in RCD. Neither of those devices is designed for that function.

---

    *Example:* The respirable dust associated with a mechanized mining unit or a designated area in a mine contains quartz in the amount of 20%. Therefore, the average concentration of respirable dust in the mine atmosphere associated with that mechanized mining unit or designated area shall be continuously maintained at or below 0.5 milligrams of respirable dust per cubic meter of air (10/20=0.5 mg/m$^3$).

30 C.F.R. § 70.101 (2013). New 30 C.F.R. § 70.101 states:

    (a) Each operator shall continuously maintain the average concentration of respirable quartz dust in the mine atmosphere during each shift to which each miner in the active workings of each mine is exposed at or below 0.1 mg/m$^3$ (100 micrograms per cubic meter or μg/m$^3$) as measured with an approved sampling device and expressed in terms of an equivalent concentration.

    (b) When the equivalent concentration of respirable quartz dust exceeds 100 μg/m$^3$, the operator shall continuously maintain the average concentration of respirable dust in the mine atmosphere during each shift to which each miner in the active workings is exposed as measured with an approved sampling device and expressed in terms of an equivalent concentration at or below the applicable dust standard. The applicable dust standard is computed by dividing the percent of quartz into the number 10. The application of this formula shall not result in an applicable dust standard that exceeds the standard established by § 70.100(a).

    EXAMPLE: Assume the sampled MMU or DA is on a 1.5-mg/m$^3$ dust standard. Suppose a valid representative dust sample with an equivalent concentration of 1.12 mg/m$^3$ contains 12.3% of quartz dust, which corresponds to a quartz concentration of 138 μg/m$^3$. Therefore, the average concentration of respirable dust in the mine atmosphere associated with that MMU or DA shall be maintained on each shift at or below 0.8 mg/m$^3$ (10/12.3% = 0.8 mg/m$^3$).

Nevertheless, as the foregoing discussion makes clear, existing rules also set silica limits, enforceable in essentially the same manner. Without a presently approved device capable of direct, real-time measurement of the silica content of RCD, MSHA has elected to reduce the potential health impact of high-silica RCD with a proxy measure: MSHA collects samples itself, with its own equipment, to determine a percentage of silica specific to a particular mine's atmosphere. When the level of silica in a mine's atmosphere crosses a threshold set by the rule (indeed, this threshold remains unchanged from prior regulations), MSHA uses a simple calculation that reduces the *overall* RCD limit below the generally applicable limits in direct proportion to the silica content it has observed. MSHA has identified further, and perhaps more direct, silica limits as a potential subject to be addressed in a future rulemaking. *See* 79 Fed. Reg. at 24,882. Even if the amendments to the rule were broad enough to give us jurisdiction over a challenge to a procedure that has been in effect for years—a doubtful proposition, at best— the history demonstrates the reasonableness of MSHA's current approach.[38]

---

[38] The petitioners fare no better with their objections based on rock dust, which is added to the mine environment and used to control combustibility within the mines. Existing standards limit the RCD and silica content of rock dust, and it is not clear how an operator meeting those standards would have further difficulty imposed in combination with the New Dust Rule.

### 3. The cumulative effect of the New Dust Rule's changes

Finally, the petitioners claim that MSHA failed to conduct a feasibility analysis that examined the cumulative effects of the proposed changes. MSHA responds that it considered extensive data from 2008–09, adjusted to reflect the new, more stringent definition of a normal production shift, in determining the ability of operators to meet the new standards. On the basis of these actual RCD measurements, MSHA concluded that the probability of compliance with the new standards was extremely high, for some areas already at 90%, and even in the very dustiest areas at 65%. It then examined *each and every* sample in excess of the new standard and determined on a case-by-case basis whether the operator had utilized existing controls, finding that they *had not* "[i]n each instance." MSHA Br. 64; *see also* 79 Fed. Reg. at 24,869 ("MSHA reviewed measurements of the engineering controls *in use on the day each sample was collected* to assess whether using additional engineering controls would have likely reduced the dust concentration to levels at or below 1.5 mg/m$^3$. *Every survey* indicated that additional control measures are available that would be likely to reduce the respirable dust concentration to 1.5 mg/m$^3$ or less." (emphases added)).[39] This data analysis is simply not the "brush off," Murray Energy Br. 39, that the petitioners

---

[39] Moreover, MSHA's data examined only whether the samples would have satisfied the RCD standard itself, without giving operators the additional benefit of the ECV table and its accounting for a margin of sampling error. *See infra* p. 78 & note 40.

claim.  The petitioners merely ask us to reweigh the evidentiary record and credit their submissions that further use of existing engineering controls is not possible.

### D.  Economic Feasibility

The petitioners also contend that MSHA did not adequately evaluate the economic feasibility of the New Dust Rule.  In their view, MSHA grossly underestimated the costs to the industry of compliance.  NMA's rather cursory discussion of this topic basically suggests that the failure of MSHA's feasibility analysis is its failure to account for the costs to the industry associated with its projected noncompliance with the new regime, specifically, "extensive revenue losses from delayed production" caused by corrective actions or the necessity of new mine plan approvals, "estimated at least at $1.6 billion per year."  NMA Br. 51.  Initially, we note that Murray Energy's assertion that MSHA's economic feasibility analysis comprises "just four paragraphs," Murray Energy Br. 55, ignores MSHA's more than 200-page separate regulatory economic analysis.  *See* I-REA-16.  Moreover, the substance of Murray Energy's economic feasibility argument is based heavily on evidence submitted to MSHA in response to the proposed rule, specifically, a study by Dr. Robin Cantor that challenged MSHA's preliminary regulatory economic analysis.  *See* I-COMM-76-1.  Murray Energy acknowledges that MSHA "appropriately responded to some of [its] critiques" in its final rule by altering some of its proposals, Murray Energy Br. 55, but believes

74

that MSHA failed to address the most significant critique, which relates to the costs of disruptions to normal operation to implement corrective measures.

There can be no question that MSHA was required to evaluate economic feasibility of the New Dust Rule. In our review of this rule's predecessor, we said so emphatically. *Nat'l Mining Ass'n*, 153 F.3d at 1269. As the petitioners and MSHA agree, MSHA must "provide a reasonable assessment of the likely range of costs of its standard, and the likely effects of those costs on the industry, so as to demonstrate a reasonable likelihood that those costs will not threaten the existence or the competitive structure of an industry." *Color Pigments Mfrs. Ass'n v. OSHA*, 16 F.3d 1157, 1163 (11th Cir. 1994) (emphasis omitted) (internal quotation marks omitted); *see also Nat'l Mining Ass'n,* 153 F.3d at 1268 & n.5 (noting that rulemaking under the Mine Act requires an economic feasibility analysis analogous to that required in OSHA rulemakings). After reviewing the record, including the extensive economic analysis undertaken by MSHA and the critique of that analysis submitted by the petitioners, we must conclude that MSHA has fulfilled its responsibility and was entitled to make the conclusions that it did.

As a preliminary matter, to the extent that the petitioners' arguments rely on their view that the Rule is not technologically feasible, those arguments are undercut by our earlier conclusion that MSHA is on solid ground with respect to the technological feasibility of operators to achieve compliance.

75

Turning to the matter of actual costs, we think that the record adequately supports MSHA's determination that the costs of compliance, while not insignificant, can hardly be characterized as so high as to threaten the existence or the competitive structure of the industry. At the outset, as the petitioners admit, MSHA certainly was not unreasonable in discounting the industry's analysis to the extent that it did not account for the significant changes made by MSHA to the final rule that improved feasibility and reduced the potential for noncompliance: an overall reduction in the number of required samples, an alteration in the RCD limit initially proposed of 1.0 mg/m$^3$ limit to the 1.5 mg/m$^3$ limit actually adopted, and the introduction of "excessive concentration values" or ECVs.[40] There remains, no doubt, a difference of opinion between the industry and MSHA about the costs associated with making the adjustments necessary to remedy violations, especially those that require the repair or replacement of faulty equipment. But such

---

[40] Excessive concentration values (ECVs) are the RCD levels, applicable to operator‑collected samples, at which corrective action must be taken. They are greater than the *actual* RCD limits, and are the result of a calculation by MSHA that grafts on to the RCD standard, to the benefit of operators, an acknowledgement of the possibility of measurement error. As stated in the preamble,

> MSHA constructed the ECVs to ensure that a citation is issued when the respirable dust standard is exceeded. The ECVs ensure that MSHA is 95 percent confident that the applicable respirable dust standard has been exceeded. Each ECV accounts for the margin of error between the true dust concentration measurement and the observed dust concentration measurement when using the CMDPSU or the CPDM.

79 Fed. Reg. at 24,868; *see also supra* pp. 6–7 & note 2.

76

differences of opinion are hardly fatal to the Rule. As long as MSHA considers, as

it has, the concerns of the industry and has supplied a reasoned view as to why it

prefers the view of its own experts, we cannot hold that its decision is arbitrary and

capricious. *See Fla. Manufactured Hous. Ass'n, Inc. v. Cisneros*, 53 F.3d 1565,

1580 (11th Cir. 1995) (holding that an agency "is entitled to rely on the cost

estimates calculated by its own engineering staff rather than the figures submitted

by the industry's trade association," where "our review of the record does not

indicate that the agency's projections are either flawed or unreasonable"). Here,

MSHA has reasoned that most such repairs and replacements will be made while

the shift continues, during the interim between shifts or during repair shifts.

I‑REA-16 at 88–89 (Regulatory Economic Analysis). It also has implicitly

recognized that, in the event of a work stoppage to correct a violation, the operator

bears the more limited cost of *delayed production*, but not the loss of its asset,

because the coal remains to be mined. Finally, MSHA has noted specifically that,

in determining the appropriate time frame for undertaking remedial work, the word

"immediate" is somewhat fluid. Certain controls can and should be exercised

instantaneously—such as the use of additional ventilation or water, while others

can be undertaken but not completed immediately—such as the ordering of a part.

In all these matters, MSHA gives due consideration to the good faith of the

operator. *Id*. at 88 (noting that some actions can occur before the next shift, but

others, such as those requiring a part to be obtained, will satisfy the "immediate corrective action" requirement with a bona fide purchase order).

MSHA has addressed adequately the economic feasibility of the New Dust Rule.

### E.  Other Challenges

The petitioners raise several additional brief objections, including a claimed failure of MSHA to consider the "best available evidence" and the experience of other agencies in implementing other health and safety laws.  *See* Mine Act § 101(a)(6)(A), 30 U.S.C. § 811(a)(6)(A).

### 1.  National regulation

Murray Energy begins with a best-available-evidence claim that the rule irrationally regulates nationally when the incidence of CWP has lessened nationwide and has spiked only regionally.  In its view, the latest scientific evidence supports the view that silica is more toxic than ordinary RCD and that cases of silicosis caused by silica exposure are mischaracterized as rapidly progressing CWP.  On this point, the scope of disagreement between the parties is narrower than the petitioners suggest.  There is no dispute that silica is a dangerous substance; indeed, the rule (as in prior rules) reduces the maximum RCD limits in proportion to a high presence of silica dust in a particular mine environment.  The parties also agree that silica has the potential to advance the progression of CWP

78

and to cause its own serious lung disease, silicosis.  The petitioners contend, however, that the evidence demonstrates that the rise in CWP upon which the New Dust Rule is predicated is really a rise in silicosis, or perhaps a rise in a subtype of CWP in which silica is the principal factor.  They claim that MSHA ignored the scientific evidence on this point.

On the contrary, MSHA devotes several pages of the preamble to addressing objections regarding RCD concentration as a predictor of CWP rates, *see* 79 Fed. Reg. at 24,823, localized spikes in CWP rates, *id.* at 24,827–28, effects of silica on CWP and data regarding silicosis, *id.* at 24,828–29, and other factors influencing CWP rates, such as the variable carbon content of coal at certain mines, *id.* at 24,829.  After reviewing the evidence cited by the petitioners as well as other evidence, MSHA concludes:

> Based on all of the available evidence, MSHA believes that respirable coal mine dust has a fibrogenic effect on the development of CWP in coal miners independent of the quartz or silica content of the coal. High silica content may accelerate the progression of CWP to PMF [progressive massive fibrosis], the most severe form of CWP, but there is no evidence to suggest that the presence of silica is a necessary condition for CWP, PMF, severe emphysema, or [non‑malignant respiratory disease] mortality.

*Id.* at 24,829–30.  The record contains a wealth of not-always consistent research on this issue, and MSHA does not cite each paper or author on which the petitioners relied in their responses.  Nevertheless, MSHA acknowledged the petitioners' concern and their data, presented contrary evidence that supported

MSHA's position, and reached a conclusion about the appropriate course based on that evidence.

The petitioners submit that MSHA merely rejected strawmen and failed to address its objections that CWP was declining and silicosis was, as a matter of epidemiology, the likelier culprit for present-day areas of concern.  We cannot accept the petitioners' contentions for two reasons:  First, MSHA's conclusion that CWP rates can improve further with further reductions to the RCD limits is a reasoned one, supported by the historical record and the data before MSHA in the present rulemaking.  Accordingly, the petitioners' assertion that "CWP is declining under the current system, i.e., the system is working," Murray Energy Br. 64, even if true, is irrelevant where CWP incidence has not been reduced *to zero* and MSHA has not completely fulfilled its mission to "protect the health . . . of the Nation's coal or other miners."  Mine Act § 2(g), 30 U.S.C. § 801(g); *see also id.* § 2(c), 30 U.S.C. § 801(c) (noting the urgent need to "prevent," not merely reduce the incidence of, "occupational diseases originating in . . . mines"); *id.* § 101(a)(6)(A), 30 U.S.C. § 811(a)(6)(A) ("The Secretary, in promulgating mandatory standards dealing with toxic materials or harmful physical agents under this subsection, shall set standards which most adequately assure on the basis of the best available evidence that *no miner* will suffer material impairment of health or functional

80

capacity even if such miner has regular exposure to the hazards dealt with by such standard for the period of his working life." (emphasis added)).

Secondly, MSHA's evaluation of the silica question is a paradigmatic example of an agency "evaluating scientific data within its technical expertise" to which "an extreme degree of deference to the agency" is appropriate. *Kennecott Greens Creek Mining Co.*, 476 F.3d at 954–55. Moreover, to the extent the petitioners' objection is focused on a regulatory need to address silicosis, not only do we defer to an agency's determination of regulatory priorities, we must acknowledge that MSHA has identified silica content in RCD as a subject for potential future rulemaking. *See id.* at 954 (finding it reasonable for the agency to regulate in an area of known risks and continue researching further potential risks).

## 2.  Use of respirators to achieve air quality standards

Next, the petitioners contend that MSHA should have accepted their proposal to allow operators to satisfy the RCD standards with the use of secondary personal controls—principally, personal respirators. MSHA counters that the statute does not permit this approach. We agree; the statute is unambiguous on this point: "Use of respirators shall not be substituted for environmental control measures in the active workings." Mine Act § 202(h), 30 U.S.C. § 842(h). The petitioners nevertheless claim that the statute, which only prohibits "substitut[ion]," allows respirators to be used *in conjunction with* other controls, as

81

a secondary measure.  MSHA does not dispute this proposition, and, indeed, acknowledges that the New Dust Rule *requires* operators to provide respirators under certain conditions, specifically, where an operator-collected sample exceeds the ECV.  *See* 30 C.F.R. §§ 70.208(e)(1), 72.700.  Therefore, nothing in the rule prevents the industry from employing respirators as part of a hierarchy of controls that should be used together as "the best way to ensure miner safety and health," NMA Br. 58.  MSHA has interpreted the statutory command correctly, however, in requiring that mine air quality meet the regulatory standard *without* resort to a personal control.

### 3.  Experience under other health and safety laws

Finally, the petitioners claim that MSHA has failed to consider "experience gained under this and other health and safety laws."  Mine Act § 101(a)(6)(A), 30 U.S.C. § 811(a)(6)(A).  In support of this claim, however, the petitioners cite only that other health and safety laws exist.  Not only are these other standards cited without any context to show that they are based on the latest technology and latest health information, they are unaccompanied by data that demonstrate their success in achieving the goal of eliminating CWP.[41]

---

[41] Additionally, we acknowledge that, in the hundreds of pages of briefing submitted in this case, the petitioners have raised additional arguments challenging the rule.  We have not addressed arguments that were insubstantial either because they lacked any legal or evidentiary support or because they were plainly without merit.

## Conclusion

MSHA acted consistently with its statutory authority in promulgating the New Dust Rule; the statute, read as a whole, clearly delegates regulatory authority for the matters covered by the New Dust Rule to its authority alone.  Substantively, MSHA's decisions comport with the requirements of the statute and are not otherwise arbitrary, capricious, or an abuse of discretion.  Accordingly, we deny the petitions for review.

PETITIONS DENIED.